## Commonwealth *v.* George K. Van Horn, Appellant.

*Jury trial—Exception after trial—Practice, Supreme Court.*

An exception allowed several months after the trial, where no objection was made at the time, has no efficacy, and cannot avail, even if it has merit.

*Criminal law—Murder—Jury—View of ground—Practice, O. and T.*

On the trial of an indictment for murder it is not error for the court to send the jury to view the premises where the murder was committed, without sending the prisoner and his counsel with them. No constitutional right of the prisoner is impaired by such action of the court.

*Murder—Charge of the court—Record—Stenographer.*

The stenographer's notes of the charge on a trial for murder showed the following sentence: "Every unlawful killing is presumed to be murder in the first degree." The trial judge upon examining the transcript inserted the words "though not" after the word "murder," and stated in his opinion on a motion for a new trial that the words "though not" were in the charge as delivered. The trial judge in the charge had fully and correctly defined the various degrees of murder. *Held,* that the Supreme Court would take the record as it stood, and would assume that the words "though not" had been inadvertently omitted by the stenographer.

*Murder—Evidence—Cross-examination of prisoner—Insanity.*

On the trial of an indictment for murder, testimony had been given to make out a possible case of insanity. The prisoner while on the stand gave a perfectly rational and minute description of all the facts precisely as he claimed they had occurred. He was then asked this question on cross-examination: "You don't say you are insane, do you?" To which he answered: "No, sir." *Held,* that the question was legitimate, and the court committed no error in stating in the charge that the prisoner made no pretense of being insane.

*Murder—Charge of court.*

Where a point presented to the court in a murder trial enumerates possible cases of the absence of self-governing power, such as insanity and gross intoxication, it is not error for the court in its answer to the point expressly to except "mere depravity or wickedness of heart."

*Murder—Trial—Comment upon the testimony.*

Where a futile attempt to make out a possibility of insanity, resulting from an injury received many years before, entirely lacks any degree of probability, it is not error for the court to characterize the testimony as "very weak." It is not only proper, but in many cases the plain duty of the court, to comment on the testimony.

Where the evidence shows a cruel, barbarous and cold-blooded murder, with every element of deliberation and premeditation fully established by abundant testimony, and the only defense is an incredible story told by the

prisoner himself, the court has not only the right to comment upon the evidence, but it is its duty to do so, and it is not error to tell the jury that the evidence is of the gravest and most serious character, and would warrant them in finding the prisoner guilty of the highest crime known to man.

*Criminal law—Murder—Jury—Qualifications of jurors—Questions to jurors on their voir dire.*

It is improper to ask a juror on his voir dire what he would do upon the whole of the testimony in a certain event, and what effect he would assign to the immoral relation between the prisoner and the deceased, or what would be his opinion as to the guilt of the defendant, though the law presumed him innocent until proved guilty.

A juror on his voir dire may not be asked the character of the opinion he had formed about the prisoner's innocence or guilt, if he has stated that he could render a just verdict on the evidence, notwithstanding his opinion.

A person may act as a juror in a murder case, although he has formed an opinion upon the case, if he states that he can go into the jury box and leave his opinion behind him, and base his verdict solely upon the law and the evidence.

*Murder—Trial—Assignment of error—Trivial error.*

The Supreme Court will not reverse a judgment on a verdict of guilty of murder in the first degree because of a trivial error which could have done the prisoner no harm.

*Murder—Evidence—Declarations of deceased.*

In a murder trial declarations of the deceased to the effect that the prisoner had murdered her, made while the blood was gushing in great quantities from the cut which had just been made across her throat, and while she was in the act of fleeing from the defendant, who himself was in the act of fleeing from pursuit, are admissible as a part of res gestæ.

*Murder—Evidence—Confession.*

On the trial of an indictment for murder, the commonwealth offered to prove a voluntary confession made by the prisoner to an officer. The prisoner's counsel then applied to the court for permission to show that a previous confession had been obtained by undue means. *Held,* that there was no error in refusing the application, although the defendant was entitled, in his defense, to testify as to the previous confession.

Argued May 30, 1898. Appeal, No. 162, Jan. T., 1898, by defendant, from judgment of O. & T. Lackawanna Co., Oct. T., 1897, No. 20, on verdict of guilty of murder in the first degree. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before ARCHBALD, P. J.

At the trial the court directed the jury to view the premises

where the offense was alleged to have been committed, in the absence of the defendant and his counsel. No objection was made at the time, but six months afterwards, on the application of defendant's counsel, the court sealed a bill of exceptions to its action in this matter.

When Edward Akerly was being examined as a juror on his voir dire he was asked by defendant's counsel: "Then you could go into the jury box with the presumption that the man is innocent; unless evidence was produced by the commonwealth that would convince you beyond a reasonable doubt of his guilt, you would then do what? What would you do, acquit or convict?

On objection by the district attorney, the court rejected the question, and sealed a bill for defendant. [13]

He was then asked by defendant's counsel: "Now, if it should be proved in the trial of this case, that the defendant, and the deceased, Josephine Wescott, lived in an immoral state, would that create in your mind a prejudice against the defendant that would affect your verdict in the case?"

The court sustained an objection by the district attorney to this question and sealed a bill for defendant. [14]

R. C. Shonk, a juror, was asked on his voir dire: "Do you understand that the law presumes a prisoner, or one accused, to be innocent until he is proved guilty? and answered, Yes, sir." The court then sustained an objection of the district attorney to this question : "Notwithstanding that, you have an opinion as to this man's guilt?" and sealed a bill for defendant. [15]

Counsel for defendant asked the juror: "Have you such a prejudice against a man and a woman living a life of adultery that would bias your judgment?"

The court sustained an objection by the district attorney to this question and sealed a bill for defendant. [17]

John B. Owens, a juror, on his voir dire having said that an opinion which he had formed was fixed " at present " in his mind, was challenged by defendant. He then stated at the instance of the commonwealth : " Could you not go into the jury box and leave that opinion behind you, discharge the opinion from your mind, and base your verdict solely upon the law and the evidence ? A. I could."

Mr. Wedeman, of counsel for defendant: "Q. Would it take strong evidence to remove that opinion from your mind? A. It would."

Mr. Jones, district attorney: "Q. If you were sworn as a juror, could you set aside the opinion, which you say you now have? A. Yes, sir. Q. And decide the case upon the law and the evidence alone, uninfluenced in any manner by what you have heard, or read, concerning this case outside of the court room? A. I could."

Mr. Wedeman: "Q. Would you go into the jury box presuming this man to be innocent as the law requires you to do?"

Mr. Jones: The commonwealth objects to the question.

By the Court: I will sustain the objection.

Exception noted for the defendant, at whose request a bill is sealed.

Mr. Wedeman: We renew our challenge for cause.

By the Court: The challenge is overruled.

Exception noted for the defendant, at whose request a bill is sealed. [16]

The court sustained an objection on the part of the district attorney to this question to the same juror, by defendant's counsel, "Would you go into the jury box presuming this man to be innocent as the law requires?" and sealed a bill for defendant.

When Frank Gehren was on the stand the commonwealth offered to prove that he saw Mrs. Wescott come out of the cellar door with her throat cut, and the blood running down in front, and also that he saw the man rushing out about the same time, whom he did not identify, and who jumped over the fence and ran away. To be followed by evidence of the identification of the man.

Mr. Wedeman: Counsel for the defendant have no objection.

Mr. Jones: "Q. Do you remember the day that Mrs. Wescott's throat was cut? A. Yes, sir. Q. Did you see her that day, did you see her with her throat cut? A. Yes, sir. Q. Go on and tell the court and jury when you first saw her and all about it. A. It was about 8 o'clock in the evening when I was playing a game of hoop-a-hoy and ran by the Nay-Aug barn and I fell and hurt my knee, and I started walking by when I

seen Mrs. Wescott come out of the cellar and Mr. Van Horn after her, and I seen Mr. Van Horn jump the fence, and I heard like the sound of wire; and she ran around and went in the house and went upstairs and come down the front, right away; she wasn't half a minute; and as soon as she seen me, I ran right in the gate, and she says, 'George Van Horn did it,' and she said, 'Frankie, get a doctor.' "

Counsel for the defendant moved to have the answer stricken out as it was not included in the offer, alleging that he did not have an opportunity to object to it, and he asked to have it stricken out.

By the Court: That is you object to the declaration made by Mrs. Wescott.

Mr. Thayer: Yes, sir.

By the Court: I will consider it now as though it had been made under the offer. I will hear you upon the motion.

Mr. Wedeman: I understand that it is not part of the res gestæ, and I object to it. We think it is not evidence and we ask to have the answer stricken out.

By the Court: Beddingfield's case was decided by Chief Justice Cockburn trying a case at nisi prius, and was the subject of considerable comment at the time. The whole narrative of the case and of its surroundings, and the cross-examination which it evoked, are to be found in the 14th and 15th volumes of the American Law Review. A review of the case is there made by Prof. Thayer, of the law school of the Harvard University, himself a very eminent authority upon the subject of evidence. The result of that review is to call in question the soundness of that decision. The eminent judge by whom it is made, even the manner of the making of his rulings, is criticised because, without any objection on the part of the defendant's counsel, evidently having some idea of what there was in the case, he stopped a witness of his own motion and excluded the evidence without further discussion. It does not seem to me that this is the law. The common mind certainly accepts a declaration of that kind under the circumstances as carrying the highest character of evidence; it is not only made at the time by the person having the best information, but under such circumstances as are strongly persuasive of the truth, and it requires the exercise of a good deal of legal learning and acumen to keep

it out. It does not seem to me that the argument upon which it is excluded correctly states the law, and I am justified in that conclusion by the decision of our Supreme Court to which the district attorney has referred me, in Com. v. Werntz, 161 Pa. 591. It is true that in that case the question arose a little differently; there the defendant sought to put in those declarations to show that he was not the one who did the deed, but that some one else was; but at the same time the reasoning upon which the Supreme Court says that this was evidence fully establishes it as evidence, not only to exculpate one but to inculpate another, and that is what is sought to be introduced here. Following that authority and what I believe to be the weight of authority in this country, notwithstanding Beddingfield's case and the cases cited by counsel for the defendant from the Supreme Court of California and Indiana, I will overrule the motion.

Exception noted for defendant at whose request a bill is sealed. [24]

The commonwealth offered to show, by Mrs. Fetterhoff, that when deceased went upstairs she went to Mrs. Fetterhoff's bedroom door at the head of the stairs calling to Mrs. Fetterhoff and Mrs. Fetterhoff went out and Mrs. Wescott told her that George Van Horn had murdered her, and that the witness took Mrs. Wescott downstairs and out on the porch and down on the steps at the place where Frank Gehrens testified that she was when she made the declarations to him.

Counsel for the defendant objected to that portion of the offer which goes to show what was said by the parties as not being a part of the res gestæ, nor of the dying declarations, therefore being merely hearsay evidence and incompetent.

By the Court: The objection is overruled; exception noted for the defendant, at whose request a bill is sealed. [25]

The commonwealth offered to prove by John Moir that he went to Wadena, in the state of Iowa, and brought George Van Horn, the defendant, back to Lackawanna county for trial; and that while en route the defendant voluntarily, without any inducement held out to him by the officer, without any hope, reward, intimidation, threats, or anything of that nature, indicating coercion, confessed to the witness that he killed Josephine Wescott, in the cellar, by cutting her throat.

Mr. Wedeman : Counsel for the defendant object to that part of the offer which refers to the confession as incompetent, and ask leave of the court to interrupt the examination of the witness for the purpose of showing that a previous confession had been obtained by undue means.

By the Court : I will allow you, when we come to that point, which refers to the confession, to cross-examine before the reception of that part of the offer.

Mr. Wedeman : The counsel having misunderstood the last ruling of the court, we now move that the court allow the examination of the witness to be interrupted for the purpose of showing a previous confession unduly obtained.

By the Court : It seems to me that the law with regard to this matter is laid down very clearly and carefully in the case of Rizollo, familiarly known as Red Nosed Mike, and following what I consider is ruled there, I will overrule this motion.

Mr. Wedeman : In this connection we offer to prove by the defendant that he was arrested by a constable near Wadena, who awakened him out of his sleep, and pointing a revolver at his head took him from there to West Union, with a revolver drawn on him all the time ; that during the ride the constable in charge of the defendant said to the defendant that Mrs. Wescott had died charging him with having murdered her, saying, " you had better tell me all about it, that if you explain it satisfactorily you will be discharged ; " also we propose to prove by the defendant that the district attorney of Fayette county told him that if he would tell him all about it, and explain it satisfactorily, that he would be discharged, and that the officers could not take him away from that state, in accordance with which he did make a statement.

By the Court : I cannot allow the practice that is suggested by this motion, allowing an interruption on the part of the prosecution for you to introduce evidence to assail an offer of evidence, for that is all that we yet have, an offer of evidence made on the part of the commonwealth. Of course the admission of the offer is for the court in the first instance, and that is the only ground at all that I can see would sustain you in your suggestion, or in your motion. It seems to me that whatever there is must come out upon your side when your time comes, and that it must be relegated to that time. Fur-

ther than that, in my judgment, what you now offer to show would not be sufficient to prevent a rejection of the testimony which the commonwealth proposes to introduce. You have the right to cross-examine this witness now with regard to anything that happened previous to that which is contained in the offer. Exception noted for the defendant, at whose request a bill is sealed. [27]

When the prisoner was on the stand, and after he had testified as to the circumstances of the killing, he was asked this question by the commonwealth: "You don't say that you are insane, do you?" Counsel for the defendant objected to the question as improper, and not cross-examination.

The Court: I see no objection to the question. Exception and bill sealed. " A. No, sir." [13]

The court charged in part as follows :

As distinguished from murder we also have manslaughter, and that, too, is divided into two degrees or into two kinds, one is voluntary and the other involuntary. Any unlawful killing, wilfully done, but without malice, is voluntary manslaughter. Any killing which is done by misadventure or accident, and yet under circumstances which do not free the party entirely from blame, is involuntary manslaughter. [Every unlawful killing is presumed to be murder (though not), of the first degree] ; [2] that is the natural inference that we draw. If we hear of a killing and consider it to have been done under circumstances that attach guilt, we immediately say, " That is a murder;" that is the common expression and it also fairly expresses the law. If it be shown, however, or if it be found upon investigating into the circumstances of a case, that this killing was done under provocation and in sudden heat of blood, this repels the idea of malice with which we would start out (because malice is the ingredient of murder),—this would repel the malice, and we would have to conclude that it was voluntary manslaughter. In other words, the crime would have to fall in our judgment from murder to voluntary manslaughter. On the other hand, if it were shown that the killing was not simply with malice, but that it was either done by means of poison or by lying in wait or by any other kind of wilful, deliberate and premeditated killing, it would raise the offense; we would have to pronounce

it murder in the first degree. The distinguishing feature of murder of the first degree, then, is the specific intent to take life; that must be present in the case, and that also must be a wilful, deliberate and premeditated intent. That will do for the definition of the different kinds and degrees of homicide. . . .

Let us first consider the testimony as to the defendant's alleged insanity. Mrs. William Gearhart, the defendant's former wife, now divorced from him and married to another, testifies that while they were living in Michigan near Saginaw, the defendant was injured in the head. The defendant also testifies to the same thing. Both these witnesses say that he was in bed for some two or three weeks. Mrs. Gearhart testifies that she noticed a change in his conduct; that she lived with him for two or three years after that, but finally was compelled to leave him on account of his conduct and get a divorce. She expresses it as her opinion that his mind was not all right—but as I took her evidence she qualifies that by saying—when he was drunk; that he seemed all right except when he was in that condition. Robert Albro, another witness produced by the defendant upon this point, says that the defendant used to complain of having a headache when he was working on the road as a brakeman; he also, however, says, as he expresses it, that the defendant was generally on a racket. [A. J. Saunders, who was not able to be here, but whose testimony was taken by deposition while in the hospital, testifies in substance that the defendant seemed a little off when he got boozy, but that he noticed nothing except then, and that he could not see anything the matter with him other than that.] [7] W. H. Nichols, a conductor on the D., L. & W. Railroad, on whose train the defendant worked at one time as a brakeman, some seven years ago I think it was, says that he discharged him because he did not think him quite right; that on one occasion he got off from the head end of the train where he was working, or where he should have been, and came back with the wild statement that the engine was going to blow up, compelling the witness to order him back to his post. Mrs. Sarah Ann Van Horn, the defendant's mother, now seventy-two years of age, says that when he first came back from the West he complained of his head; sometimes sat (I think she said) with it in his hands and said, " Mother, my head is not right," and would sit down and cry and said that

he would have to have his head operated upon ; she does not think he was of sound mind.   Upon cross-examination she said he drank considerably, but did not think that his trouble was caused by that.   Harry Depue says that he met the defendant on one occasion and saw a peculiar look in his eye, as though he did not know what he was talking about, and from that he should say he was unsound in mind.

Opposed to this we have the testimony of Dr. Newton, who testified that he examined him in 1892 when the Railroad Train-men's policy was taken out; that his examination was necessarily directed also to his mental condition, and that he should say he was of sound mind.   George Neiman, who has known the defendant, as he says, a dozen years, considers him sound. Mr. Southard has known the defendant a number of years and never knew anything about him that was insane.   Emma Wescott is to the same effect.   Mrs. Neiman says he talked just as sensible as anybody.

Now, when you consider that the main testimony is directed to that which happened to this defendant a long number of years ago ; this accident out in Saginaw being some twenty years ago ; this condition of mind that Mr. Nichols testifies to being, I think, some seven years ago, and also the fact which is undisputed that the defendant was dissipated and given to drinking, it seems to me that it is very weak testimony on which to say that the defendant, at the time this deed was committed, was so out of his mind that he was not responsible for his acts.   [I imagine that it is very natural for a man, who is dissipated in the way that is described here, to have a headache, and to have it often, and that this is such a matter of common experience that I may allude to it.   And during all this time, out of all the persons who must have been thrown in contact with him in one way or another, only these few are produced who suggest or give it as their opinion that he was at any time of unsound mind, and some of these only say it was when he was boozy, referring as I imagine to when he was under the influence of liquor.] [12]   There is no location of the injury except that it was generally in the head ; no physician is brought who has examined him except Dr. Newton, and his testimony is against this idea ; no physician, I say, other than Dr. Newton, who testifies after an examiaation that he is or would likely be

under any condition such as we have in this case, insane, of unsound mind, or irresponsible for his acts on account of that condition. [Further than this the defendant himself makes no such pretense. This is something that is advanced by his counsel.] [4] It is true it may be said that a crazy man would not know enough to say he was crazy; that is true; but you have seen him on the witness stand yourselves, you have heard his story; he says he remembers; he gives a detailed account of what happened; he professes, as I remember it, to remember all; and he frees himself in his story from blame. Looking at him, seeing him there, do you believe that he is not a man of sound mind, in his sober senses, or that he was not so at the time when this deed was committed? . . . .

Let us now take up and consider at some little detail the evidence upon which the commonwealth relies for a conviction. First let us look at the relations existing between these parties. That Mrs. Wescott up to the time of the killing, or near it, had accepted the defendant in place of her husband, is clearly established by the evidence. She had separated from her husband for some time. While living on Spruce street the defendant had occupied the nominal position of a boarder there, but, according to the testimony of Mr. Saunders, it was really understood that their relations were otherwise. [Now this relation, this of lover and mistress, which existed between the defendant and Mrs. Wescott, is worth stopping to consider for a moment. As it is itself a violation of the moral as well as the written law, it is very likely from that very circumstance to bring other violations of the law in its train. If a man offends against the law in one respect it is very apt to entangle him in another. One of the most natural things growing out of just such a relation is jealousy. As such an illicit relation is a very free and easy one the inclination of the one party to throw aside the other and take up with a new person according to fancy follows almost as a matter of course. This naturally excites jealousy in the party who is put aside in that way, and, jealousy once established, it is but a step to such a crime as we have here charged. How many times, as a matter of common experience, as a matter that we see from the daily prints, do we find murder as the outgrowth of just such a relation as this, and the jealousy that comes from its disturbance by the one

party or the other.  An accepted lover is rejected by his mistress and he revenges himself by taking her life.  That is what is charged here.] [11] . . . .

[You see, then, this evidence of the immediate occurrence, if we had nothing else, in brief, would go to show that Mrs. Wescott while down cellar after potatoes to mix her bread on that Friday night in the dusk of the evening, in the dark, had her throat cut by a razor in the hands of the defendant, who immediately dropped it and fled.  If this be so, that is to say, if you believe this evidence, if it establishes these facts to your satisfaction, here are all the elements of wilful, deliberate and premeditated murder, and would warrant a conviction for the same.] [19]

I have said that the defendant immediately fled.  I have also said that this evidence showed that the cutting was done by the defendant.  Both those facts I may say are undisputed facts in the case.  In stating that, however, I have anticipated the evidence bearing upon the question of flight.  Frank Gehrens testifies that he saw the man who came out of the cellar immediately jump over the fence, using the ash barrel to help him ; that he heard the twang or noise of a wire as he went through the adjoining yard, that wire being a clothes line.  Wesley Kresge, who lives in the premises next door, says that he heard just about that time the noise of the wire.  Mrs. Emma Bacon says she met the defendant in Page court right there where the electric light is ; that he was walking fast.  And George Isadore saw him at the corner of the alley on Mifflin avenue.  Immediate search by parties in the neighborhood and down cellar found no one.  The same search, continued to places where it was possible that the defendant might be, did not find him.  Nearly a year later he is arrested in the distant state of Iowa.  This evidence of itself is enough to say that the defendant fled, but we have much more upon that point than this.  We need to go no further than the defendant's own tale about his course.  He says he was scared; that he went out of the cellar and jumped the fence, and then out along the alley, just as these witnesses say they saw him go.  He then went down along the Delaware and Hudson Railroad and from there he does not tell exactly where he went, as I remember, except that the next account he gives of himself is when he came up the next morning and got something to eat at some person's house ; [he says

he cannot tell, but what he was helped by this young girl who
testifies that she did give food to some man the next morn-
ing.] [20]   He says he cannot say where he staid that night or
whether he went out of the city or not; but he does state that
he went through Moscow; he does state further that at Wim-
mers the next day someone let him have a paper and he saw the
heading about this transaction and the declaration there that it
would be murder if Mrs. Wescott died.   And then that he walked
from there to Hawley, where he hired on a canal boat which
took him out to the Hudson river and there with a tug he went
on to Troy or West Albany.   From there he went to Buffalo;
then as I recollect it he went into Ohio, and finally to Wadena,
in Iowa, where he was finally arrested.   [Mr. Saunders testifies
that he saw the defendant the next evening here down in the
yard.   I do not see how it is possible for him to have done so
if the defendant's own story is correct, because by that time he
had gone out through Moscow and Wimmers, and was on his
way to Hawley.   He does not himself pretend that the next
day he was here.] [21]

Mr. Wedeman: It was the next morning Mr. Saunders said
he saw him, about 6 o'clock in the morning.

By the Court: Furthermore this testimony of the defendant
with regard to what he did is substantially the same story that
Detective Moir and Lieutenant Davis say that he told them about
his goings when he was on the way here from the West in their
charge.   It is argued to you that this confession was wrested
out of him, and the points that the defendant's counsel put to
me suggest that, and ask me to charge you that such a confes-
sion is worth nothing.   I did so charge you; that the confes-
sion must be voluntary; but so far as this part of the confession
is concerned it corresponds exactly or substantially with what the
defendant himself says.   There are one or two particulars that
the detective and Lieutenant Davis give a little more fully; for
instance one of them says that he said he went up Alder street
by the M. Robinson brewery, and over through the South Side
and on to the mountain, and did not stop until he got into the
bush.   While he himself does not give that immediate course,
yet he gives enough to suggest it.   So that it seems to me,
whether you look at the testimony of the officers as to what he
said, or whether you confine yourself entirely to what he testi-

fies himself, I am justified in saying that immediately after the occurrence the defendant fled from his usual places of resort in this city into unfrequented or somewhat unfrequented parts of this county, and immediately thereafter into another state, and then finally into the very distant state of Iowa. This of course is most significant in this matter. Flight is the natural and accepted evidence of conscious guilt. The Good Book says, " The wicked flee when no man pursueth, but the righteous are bold as a lion." It must be remembered, however, that flight, while the result of fear, may be the result also of innocent fear. Some men are more timid than others, and caught by some sudden emergency may take to their heels and leave, even though they be innocent. That is true. And therefore you have to distinguish between the two cases, whether the flight in any given instance is the result of the one or the other. The defendant says he was scared. Was he scared simply because he was involved in something that might incriminate him and, therefore, fled, fleeing innocently, although in fear, or was his flight actuated by conscious guilt? That is for you to say. You are to judge of that from the circumstances and the manner and method of his flight, the distance he went, all that, and all the other circumstances that precede and surround this case, or are found in it. I am called upon to charge you, most assuredly, that the most with regard to this unquestioned flight is that it was a circumstance, not conclusive by any means, but to be judged of and to be given weight to according to the other facts and circumstances which we have. It is for you to say whether it was the result of innocent fear or of conscious guilt, such as the commonwealth charges.

[This, then, is the array of evidence which the commonwealth has made against the defendant: His illicit relations with the woman who was killed ; an alleged disturbance of that relation resulting in his arrest ; his anger and possible jealousy, followed by his threats to do her violence even to just what is here charged, to wit: the cutting of her throat; his skulking and lurking in the neighborhood of the premises as though watching an opportunity; the killing of the deceased by the cutting of her throat, in the cellar, in the dark, which the defendant admits to have been done by himself with a razor; his immediate disappearance and extended flight. It

must be confessed that this is evidence of the very gravest kind ; of the gravest and most serious character; and as I have already said, would warrant you in finding the defendant guilty of the highest crime known to the law, no less than murder of the first degree.] [10]

Defendant's point and the answer thereto among others were as follows :

10. If the jury find that, at the time of the committing of the act which caused the death of Josephine Wescott, the defendant was wanting in this self-governing power, whether caused by insanity, gross intoxication, or other controlling influences, —[here I will put in a word or two—other than mere depravity or wickedness of heart,] then his mind was not fully conscious of its own purpose, and he was not guilty of murder of the first degree.   *Answer :* With that correction of the point I affirm it.  [6]

Verdict of guilty of murder in the first degree, upon which judgment of sentence was passed.

*Errors assigned* were (1) in granting the view; (2, 4, 7, 10-12, 19-21) portions of charge as above, quoting them; (6) answer to defendant's point; (13-18) rulings on questions to jurors; (3, 24, 25, 27) rulings on evidence, quoting the bill of exceptions.

*Edward W. Thayer* and *L. P. Wedeman*, for appellant.—The view was improperly allowed: Com. v. Knapp, 9 Pick. (Mass.) 515; Smith v. State, 42 Texas, 444; Bertin v. State, 24 La. Ann. 46 ; Somer v. Huber, 183 Pa. 165.

The defendant is not bound to prove insanity beyond a reasonable doubt: Meyers v. Com., 83 Pa. 131.

Where the judge charges upon a mistaken view of the evidence a new trial must be granted: Com. v. Taylor, 10 Phila. 184; Com. v. Pipes, 158 Pa. 25 ; Com. v. Silcox, 161 Pa. 484; Curry v. Curry, 114 Pa. 367.

The questions to the jurors were proper: Howser v. Com., 51 Pa. 337 ; C. & A. R. R. v. Buttolf, 66 Ill. 348; People v. Brown, 72 Cal. 390 ; People v. Hamilton, 62 Cal. 379.

A confession, though apparently made, is prima facie incompetent, if it be shown that the accused made a previous con-

fession which was not voluntary: Barnes v. State, 36 Texas, 356; State v. Drake, 82 N. C. 592; State v. Brown, 73 Mo. 631; Com. v. Harman, 4 Pa. 269; Brown v. Com., 76 Pa. 319; Rizzolo v. Com., 126 Pa. 54.

*John R. Jones,* district attorney, for appellee.—The view was properly allowed: Com. v. Salyards, 159 Pa. 501; Com. v. Miller, 139 Pa. 77; Chute v. State, 19 Minn. 230; State v. Adams, 20 Kan. 311; State v. Coella, 8 Wash. 512; Reg. v. Whalley, 2 Cox Cr. Cases, 231; Reg. v. Martin, 12 Cox Cr. Cases, 204; 1 Thompson on Trials, sec. 885, et. seq; Bishop's New Crim. Proc. (4th ed.) sec. 965, (3); Shular v. State, 105 Ind. 289; Sasse v. State, 68 Wis. 531; Close v. Samm., 27 Iowa, 503; Jeffersonville, M. & I. R. Co. v. Bowen, 40 Ind. 545; Heady v. Vevay, etc., Turnpike Co., 52 Ind. 117; Gagg v. Vetter, 41 Ind. 228; Indianapolis v. Scott, 72 Ind. 196; State v. Ah Lee, 8 Oregon, 214; Neal v. State, 32 Neb. 120; State v. Congdon, 14 R. I. 458; People v. Bonney, 19 Cal. 427; People v. Green, 53 Cal. 60; Rutherford v. Com., 78 Ky. 639; Com. v. Knapp, 9 Pick. (Mass.) 515; State v. Claudius, 1 Mo. App. 551; Luck v. State, 96 Ind. 16; Blythe v. State, 47 Ohio, 234.

The judge approved the record and it must stand with the correction of the transcript made by him: Smith v. Times Pub. Co., 178 Pa. 481; Pool v. White, 171 Pa. 500; Com. v. Arnold, 161 Pa. 327; Hill v. Egan, 160 Pa. 119; Harris v. Traction Co., 180 Pa. 184; Rosenthal v. Erlicher et al., 154 Pa. 396.

A nonexpert may be asked his opinion as to the mental condition of the defendant, after detailing sufficient facts upon which to base an opinion or conclusion: Wilkinson v. Pearson, 23 Pa. 117; Titlow v. Titlow, 54 Pa. 216; Pidcock v. Potter, 68 Pa. 342; Shaver v. McCarthy, 110 Pa. 339. A fortiori the defendant may be asked a question involving his mental condition although, in answering it, he is obliged to state a conclusion: Com. v. Fitzpatrick, 1 Pa. Superior Ct. 518.

The court had a right to comment on the facts: Ortwein v. Com., 76 Pa. 414; Laros v. Com., 84 Pa. 200; Sayres v. Com., 88 Pa. 304; Coyle v. Com., 100 Pa. 573; Johnson v. Com., 115 Pa. 369; Com. v. Orr, 138 Pa. 276.

The questions asked the jurors were properly excluded: Rizzolo v. Com., 126 Pa. 54; Com. v. Taylor, 129 Pa. 534; Hall

v. Com., 22 W. N. C. 25 ; Com. v. Hanlon, 3 Brewster, 461 ;
Clark v. Com., 123 Pa. 555 ; Woollen v. Wire, 110 Ind. 251 ;
State v. Arnold, 12 Iowa, 479 ; State v. Slave Bill, 15 La. Ann.
114 ; State v. Davis, 14 Nev. 439 ; Thompson on Trials, sec. 102 ;
Bish. New. Crim. Proc. (4th ed.) sec. 906 ; Higgins v. Mina-
ghan, 78 Wis. 602 ; State v. Hoxsie, 15 R. I. 1 ; Shields v. State,
95 Ind. 299 ; Spies v. People, 122 Ill. 1 ; United States v.
Noelke, 17 Blatch. 554 ; Staup v. Com., 74 Pa. 458 ; Com. v.
Flanagan, 7 W. & S. 415 ; O'Mara v. Com., 75 Pa. 424 ;
Myers v. Com., 79 Pa. 308 ; Allison v. Com., 99 Pa. 33 ; Curley
v. Com., 84 Pa. 151 ; Com. v. Crossmire, 156 Pa. 304.

The declarations of the deceased were a part of the res gestæ :
Com. v. Werntz, 161 Pa. 591 ; Pennsylvania v. Stoops, Add.
381 ; Small v. Com., 91 Pa. 304 ; Kehoe v. Com., 85 Pa. 127 ;
Sullivan v. Com., 93 Pa. 284 ; Allison v. Com., 99 Pa. 17 ;
Kane v. Com., 109 Pa. 541 ; Kilpatrick v. Com., 31 Pa. 198.

The ruling on the confession was proper : Fife v. Com., 29
Pa. 429 ; Com. v. Mosler, 4 Pa. 264 ; Com. v. Johnson, 162 Pa.
63 ; Brown v. Com., 76 Pa. 319 ; Gray v. Com., 101 Pa. 380 ;
Rizzolo v. Com., 126 Pa. 54 ; Com. v. Taylor, 129 Pa. 534 ;
Com. v. Shaffer, 178 Pa. 409.

OPINION BY MR. JUSTICE GREEN, October 17, 1898 :

On the trial of this case the jury was allowed to view the
premises where the killing took place.    When the motion for
that purpose was made no objection was offered to it, and nei-
ther then, nor at any time during the trial, was any exception
taken to the order of the court allowing the view, nor was there
then, nor is there now, any complaint made that any, even the
slightest, irregularity occurred during the view.    No witness
was examined, nothing was said to the jury, no action of any
kind was taken, the defendant and his counsel were at liberty
to attend the view if they chose, the jury simply saw the prem-
ises and returned to the box.    Several months elapsed when
the counsel for the defendant asked the court to allow an excep-
tion on this account.    The request was granted, not because
an exception had been taken at the trial, but because the learned
trial judge was generously willing to allow the defendant any
opportunity he chose to ask to make a point in his favor.    As
a matter of course an exception thus obtained has no efficacy,

and could not avail, even if it had merit; but it has none. No right of the defendant was in any degree impaired or affected by the mere fact of the view. It served to make the testimony more intelligible to the jury, but that is not impairing a constitutional right in any conceivable sense. The very point now made was before us in the case of Com. v. Salyards, 158 Pa. 501. It was an indictment for murder, and on the trial the court sent the jury to view the ground and premises in the absence of the prisoner and his counsel. This was assigned for error, but we sustained the judgment in a brief per curiam opinion in which we said, the present Chief Justice delivering the opinion, "We have given to each assignment of error and all of them that consideration which their importance demands, and have failed to discover therein, or in any part of the record, any error that would justify us in reversing the judgment." The same question was before us in the case of Com. v. Miller, 139 Pa. 77, which was an indictment for maintaining a public nuisance. Our Brother WILLIAMS delivering the opinion, said, "The request of the defendants that the jury be permitted to view the alleged nuisance and see its situation and surroundings, before passing upon them, was a reasonable request, and in view of the magnitude of the interests involved it is difficult for us to understand why it was not granted by the court. It was however a matter fairly within the discretion of the court, and we cannot say that it was an abuse of that power to refuse the application, upon anything now before us." In the celebrated case of Com. v. Webster, 5 Cush. 298, which was an indictment for murder, the attorney general, after opening the case, suggested that it would be desirable that the jury should go to the medical college and take a view of the premises where the murder was alleged to have been committed. Chief Justice SHAW who presided at the trial said that they had no doubt of their authority to grant a view, and directed that the jury should be permitted to take a view of the medical college on the next morning before the coming in of the court, attended by two officers and one counsel on each side. The accused was not present at the view. In a well-considered case, Shular v. State, 105 Ind. 289, also an indictment for murder, a view was directed by the court, and it was contended, on error assigned, that the defendant by his ab-

sence was deprived of a constitutional right, but the court said: "It is the duty of the jurors to view the premises, not to receive evidence, and nothing could be done by the defendant or by his counsel if they were present, so that their presence could not benefit him in any way, nor their absence prejudice him." A similar ruling was made in State v. Adams, 20 Kan. 311, as also in a number of other cases. While there are a few contrary decisions, we are of opinion that the weight of authority is in favor of the granting of the view. As we are unable to see in what manner the mere absence of the defendant at the view works a deprivation of any constitutional right, considering that no testimony was or could be taken during the view, and as the granting of the view is a matter of discretion with the court below, and no abuse of that discretion is either proved or alleged, we cannot sustain the first assignment of error, and therefore dismiss it.

The second assignment cannot possibly be sustained because the record, as it comes to us, gives no indication that the words which it is alleged were omitted from the charge were in fact omitted. We must take the record as we find it, and as we find it the instruction of the court was perfectly correct. But it is incredible that it could have been otherwise, because the learned trial judge, in the immediately preceding part of the charge, had expressly and much more fully charged the jury in precise accordance with the instruction as it now appears, and could not have charged as claimed by the defendant without stultifying himself. Thus he charged: "There are two degrees of murder. Any murder which is perpetrated by means of poisoning or by lying in wait, or by any other wilful, deliberate and premeditated killing, is murder in the first decree. The same is true if it be committed in the perpetration of, or in the attempt to perpetrate, any arson, rape, robbery or burglary. All other murder is murder in the second decree." He then defined manslaughter in both its degrees, and then said, "Every unlawful killing is presumed to be murder, though not of the first degree." The defendant now asks us to decide that the words "though not," were omitted in the charge as actually delivered. It is enough to say, that we have no right to change the record in this manner, and even if we had we would not do it, because it is impossible to believe that the court could have

given two such contradictory instructions in the same breath. Moreover the learned judge in his opinion on the motion for a new trial expressly states that the words were in the charge as it was actually delivered, and that their absence from the stenographer's notes can only be attributed to the failure of the stenographer to hear them when his notes were made. The stenographer is not the judge and must not be endowed with any such functions when he and the judge are in conflict upon such a subject as this.

. The third and fourth assignments are entirely devoid of merit. The defendant was on the stand, and testimony had been given with a view to make out a possible case of insanity; but as he had given a perfectly rational and minute description of all the facts, precisely as he claimed they had occurred, it was simply incredible that he could have been insane at the time the offense was committed or at the time he was testifying. He was therefore simply and very naturally asked: " Q. You don't say you are insane, do you? A. No, sir." Assuredly this was a perfectly legitimate question, and the comment of the court complained of in the fourth assignment was literally correct and entirely justified by the evidence. It is only necessary to read the immediate context of the charge to understand this. These assignments are dismissed.

As to the fifth assignment an examination of the testimony of the witnesses shows clearly that the comment of the trial judge here complained of was entirely correct, and the assignment must be dismissed.

Sixth assignment. The qualification in the answer to the defendant's tenth point was in precise conformity with the ruling in the case of Com. v. Drum, 58 Pa. 9, from which the point was manifestly taken, and therefore was in no sense erroneous. Judge AGNEW in his charge in that case expressly excepted out of the enumerated possible cases of the absence of self-governing power, " that wickedness of heart which drives the murderer on to the commission of his crime reckless of consequences," and this was all that was excepted by the court below in the qualification of the point. The assignment is dismissed.

The comment of the court upon the testimony of Saunders, complained of in the seventh assignment, was strictly correct,

as is proved by a reading of the testimony, and the assignment cannot be sustained.

The contention expressed in support of the ninth assignment is in direct hostility with the positive testimony of several witnesses, especially Mrs. Fetterhoff, George F. Wickenhoffer and W. J. Brimble, and the assignment is therefore dismissed.

Eighth, tenth, eleventh, twelfth and nineteenth assignments. In all of these assignments the substance of the complaint is that the charge of the learned court below was inadequate, in excess of legal restrictions as to some of the matters stated, and unfair to the defendant, in giving undue prominence to the facts which tended against the defendant, and not sufficient prominence to those which turned in his favor. After a most painstaking, minute and careful reading of the whole of the charge, and again and again of the parts specially set forth in these several assignments, we are constrained to say that we do not regard these assignments as being sustained in any degree. No one can read the testimony in this case without being convinced that the offense committed was a most cruel, barbarous and cold-blooded murder, with every element of deliberation and premeditation fully established by abundant testimony. A number of witnesses testified to previous threats made by the prisoner that he would kill the woman whose life he subsequently took, and three of them testify that he said he would cut her throat. Mrs. George Neiman testified that he said, only four days before the murder, " that he would cut her throat from ear to ear; would kill her; that he would not hang, for he would go to York state and get out of reach." As this was precisely what he did do in a most inhuman and barbarous manner, the charge of premeditation must be regarded as having been established by testimony of the most conclusive character. That there was a strong motive for these threats and their subsequent execution was fully proved by the fact that the woman had, just before the threats were made, preferred a criminal charge of burglary and larceny against him, on which he was arrested and brought before a magistrate, and the threats were made in connection with, and in consequence of, that proceeding. His relation with the woman was precisely as it was stated by the court. She was his mistress, and they were constantly indulging in illicit intercourse for several years, and up

to the very time of the murder. That such a relation should give rise to jealousy, and that jealousy often leads to crime, is a matter of only too frequent occurrence in the every day history of events. A feeble attempt to make out a possibility of insanity resulting from an injury received many years before was so entirely lacking in any degree of probability that the court, very naturally and with entire correctness, characterized the testimony on this subject as being "very weak." The theory that the killing was the result of an accident, occasioned by the defendant supposing that he was drawing the back of the razor across the throat of his victim, was so utterly preposterous that there could be no rational expectation that any jury of sensible men would give it the least consideration. Yet the court left that question to the jury, calmly and without adverse comment, not only in the affirmance of the defendant's eighteenth point, but also in the general charge. The foregoing comments have reference to the various subjects of complaint that are covered by the assignments we are now considering. That a trial judge should abstain from comments on the testimony in such a case as this could not possibly be expected. It would be a violation of his plain duty if he did. The remarks that he did make were, not only fully warranted by the testimony, but were imperatively demanded by the extraordinary developments appearing as the evidence was unfolded. All the leading and controlling facts necessary to make out an aggravated case of murder in the first degree were without contradiction. There was no doubt that the victim was murdered by having her throat cut from ear to ear, as it were. And there was no doubt that the deed was done by the defendant. He so testified himself. There was no sudden quarrel, no angry dispute, no heat of contest, no fear of personal violence, no presence of weapons on his victim; he was a man, she was a woman, sitting quietly by his side, no circumstance, not one, which in the least possible degree mitigated, or tended to mitigate, the atrocity, the cruelty, the diabolical wickedness of the murderous act. And all this upon his own testimony. His story of the accidental killing was too silly to delude a child; it only added the crime of perjury to the crime of murder. If there was no presentation by the trial judge of facts favorable to the prisoner, it was because there were no such facts in the

evidence.   But there was also no inflamed, or passionate, or partisan presentment of the testimony.   On the contrary, the whole charge of the learned court was calm, fair, reasonable and dignified, and in entire accord with the testimony.   We are thoroughly persuaded that there is no particle of merit in any of these assignments, and they are therefore dismissed.   As to the right and the duty of a trial judge in commenting upon the testimony in homicide cases, it is only necessary to refer to the decisions of this court in the cases of Johnson v. Com., 115 Pa. 369, Com. v. Orr, 138 Pa. 276, and Com. v. Buccieri, 153 Pa. 535.

Thirteenth, fourteenth, fifteenth, sixteenth, seventeenth and eighteenth assignments: these all relate to the qualifications of jurors, and may be considered together.   Upon an examination of the whole of them we are of opinion that the rulings were in conformity with our modern decisions.   A few of the questions asked were of a somewhat unusual character, and may be specially considered.   Thus the rejected questions to Juror Ackerly inquired as to what he would do upon the whole of the testimony in a certain event, and what effect he would assign to the immoral relation existing between the defendant and Mrs. Wescott.   As these are not the tests of the juror's mere competency to sit as a juror, and as the inquiries simply related to the possible action of the juror upon hypothetical conditions, it is manifest that they should have been rejected. So, also, as to the juror Shronk, who had qualified himself by his answers to the preliminary questions, and was then asked what would be his opinion as to the guilt of the defendant, although the law presumed him to be innocent until he was proved to be guilty.   As this would substantially require the juror to express his opinion upon the whole of the testimony, in other words, to announce his verdict without knowing what the testimony would be, it was clearly incompetent.   The question was quite similar in character to the rejected question in Hall v. Com., 22 W. N. C. 25, where two jurors were asked whether they would consider insanity a good defense if it was fully proved on the trial.   The court below refused to allow the question to be put and we sustained the ruling.   The juror Owens qualified himself clearly by his answers to questions. He stated distinctly that he could go into the jury box and

leave his opinion behind him, and base his verdict solely upon the law and the evidence. Under all our decisions this is sufficient. Thus in Staup v. Com., 74 Pa. 458, AGNEW, J., said: " But where the opinions or impressions of the juror are founded on rumors or reports, or even newspaper statements, which the juror feels conscious he can dismiss; where he has no fixed belief or prejudice, and is able to say he can fairly try the prisoner on the evidence, freed from the influence of such opinions or impressions, he ought not to be excluded." To the same effect are O'Mara v. Com., 75 Pa. 424; Ortwein v. Com., 76 Pa. 414, and other cases. The additional question whether he would go into the jury box presuming the prisoner innocent was quite unnecessary, and had been covered by his previous answers. These assignments are dismissed.

The matter of the twentieth assignment is too unimportant to consider as a cause of reversal. It was nothing but a reference by the court to the testimony of the defendant, in which he spoke of getting something to eat at some person's house the next morning. It is complained that there is some discrepancy in the testimony as to whether it was the next morning, but as the defendant only said that he could not " tell but what he was helped by this young girl," it committed him to nothing, and does not amount to a contradiction, whether she gave him the food the next morning or a month later or not at all. The assignment is too trivial for serious consideration and is dismissed for that reason. The same is true in a still stronger degree of the twenty-first assignment, in which the judge made reference to the testimony of Saunders, and remarked that he did not see how it could be correct if the defendant's statement was correct. It was of no consequence to the defendant whether Saunders was mistaken or not, and the assignment is dismissed.

The twenty-second assignment is not sustained, because an examination of the testimony shows that the judge was correct in his statement of the testimony as to the threats. The same is true as to the twenty-third assignment. The court correctly stated the testimony of Mrs. Fetterhoff. The additional remark of the judge that this was probably fifteen or twenty minutes before the killing was perhaps literally correct, but whether it was a few minutes more or less was not of the slightest possible consequence. There was no question of the guilt or in-

nocence of the prisoner depending in the least degree upon this remark of the judge.

Twenty-fourth and twenty-fifth assignments: these relate to the declarations of the deceased when she was seen just after coming from the cellar, with her throat cut and profusely bleeding. The declarations in question were made by the deceased immediately after she came from the cellar and while the blood was gushing in great quantities from the cut which had just been made across her throat. She was in the act of fleeing from the defendant who had inflicted the wound, and he was in the act of fleeing from pursuit at the instant when the declarations were made. They were all part of the same transaction. In point of time the declarations immediately followed the cutting, and in point of distance the declarations and the cutting were on the same premises. There could scarcely be any greater propinquity of both time and place. There cannot be a moment's doubt that the declarations were the spontaneous utterances springing out of the transaction itself. We are clearly of opinion that they were competent evidence as part of the res gestæ. We consider the question as ruled by our decision in the case of Com. v. Werntz, 161 Pa. 591. In that case the witness testified that he was at the door, outside of the shed where the fight took place, and heard the deceased say, " the coon did it," and that when he was brought out of the shed the same expression was repeated; that the deceased was then carried to a barber shop across the street where his wound was dressed. Our Brother MITCHELL delivering the opinion said : " Witness was then asked whether Gallagher, while lying on the floor of the shop, had made the same or a similar declaration. This was excluded as too remote. The interval of time from the stabbing and the distance of the barber shop from the shed do not appear with exactness, nor are they material, for it is apparent they were not great, and that the continuity of the events was not broken. The declarations were by the party best informed and most interested, and were made at a time and place, to a person, and under circumstances, which effectually excluded the presumption that they were the result of premeditation and design. If such declarations were in fact made by Gallagher, they were the most material evidence in the case, and should have been admitted." All of the fore-

going comments are directly applicable to the present case. The declaration made to Frank Gehrens, was as follows: he testified: "It was about 8 o'clock in the evening when I was playing a game of hoop-a-hoy, and ran by the Nay-Aug barn; and I fell and hurt my knee; and I started walking by, when I seen Mrs. Wescott come out of the cellar, and Mr. Van Horn after her; and I seen Mr. Van Horn jump the fence. I seen him jump the fence and I heard like the sound of a wire, and she ran around and went in the house and went upstairs and came down the front right away; she wasn't half a minute, and she came out; as soon as she seen me, I ran right in the gate and she says: 'George Van Horn did it;' and she said, 'Frankie, get the doctor,' and I ran after Dr. Burnett." The declaration made to Mrs. Fetterhoff was, "that her throat was —that she had been murdered, and that George Van Horn had done it." This was made at the moment she was in the house, as testified by Gehrens. When it is considered that these declarations were made as quickly as they could be made after the occurrence, to the persons to whom they were made, in an immediately succeeding order of events, by the person best qualified to know, and most deeply interested, and in such circumstances as to preclude all idea of premeditation or design, it is manifest that they come exactly within the ruling in the Werntz case, and the reasoning there expressed. The assignments are dismissed.

The twenty-seventh assignment cannot be sustained. When the commonwealth offered to prove a voluntary confession made by the prisoner, his counsel applied to the court for permission to show that a previous confession had been obtained by undue means. The court refused the application, and the testimony proceeded in the regular way. If the application had been granted it could not have prevented the admission of the commonwealth's evidence, and the only result would have been a question of credibility as between the prisoner and the officer who testified to his voluntary confession. The prisoner was entirely at liberty to cross-examine the officer fully as to all the circumstances in which the confession was made. And he was further at liberty to testify himself in defense and give his own statement as fully and completely as if he had been permitted to do so in advance of the proof by the commonwealth. In the

end, the duty of the jury would have been precisely the same in each case. They would have been obliged to decide as to which witness they would believe. If they believed the defendant they would reject the confession, if they believed the officer they would accept the confession. The offer was of an unusual character, and the court in rejecting it followed the decisions of this Court in Rizzolo v. Com., 126 Pa. 54, and other cases. When the defendant was subsequently examined he testified fully upon this subject. He was contradicted by two disinterested witnesses and the jury believed them and did not believe him. This they had a perfect right to do, and could scarcely have done otherwise. The assignment is dismissed.

The judgment is affirmed and the record is remitted in order that the sentence may be carried into execution according to law.