No. 2599

## STATE v. WILLIAMS

December 5, 1923.                    220 Pac. 555.

1. CRIMINAL LAW—GENERAL OBJECTION TO ADMISSION OF TESTIMONY, NOT WHOLLY INCOMPETENT, IS INSUFFICIENT.

   A general objection to the admission of testimony, unless it is wholly incompetent, is insufficient.

2. CRIMINAL LAW—OVERRULING GENERAL OBJECTION TO ANSWER OF EXPERT AS TO WHETHER WOUND WAS SELF-INFLICTED, NOT ERROR.

   Where expert stated in response to a question calling for his opinion as to whether a wound was self-inflicted that it could not have been, there was no error in overruling a general objection to such answer.

3. CRIMINAL LAW—OVERRULING GENERAL OBJECTION TO ADMISSION OF PHOTOGRAPH OF ROOM WHERE SHOOTING WAS DONE NOT ERROR.

   In a murder prosecution, overruling of general objection to admission of a photograph of the room where the shooting was done, showing bed, bedclothes, and a discoloring on a pillow, was not error, especially where there was nothing therein to incite passion and prejudice.

4. CRIMINAL LAW—INSTRUCTION AS TO CONSIDERATION OF DEFENDANT'S TESTIMONY HELD, IN VIEW OF INCREDIBILITY THEREOF, NOT PREJUDICIAL.

   In a murder prosecution, where defendant's testimony that deceased shot himself while trying to kill her was incredible, notwithstanding Rev. Laws, 7160, as amended by Stats. 1915, c. 157, which provides that no special instruction shall be given relating exclusively to defendant's testimony, or directing the jury's attention thereto, an instruction as to consideration of her testimony *held* not reversible error, in view of section 7469, which provides that no judgment shall be set aside for misdirection of the jury unless it has resulted in miscarriage of justice.

APPEAL from Ninth Judicial District Court, White Pine County; *C. J. McFadden,* Judge.

Dawn Margaret Williams was convicted of manslaughter, and she appeals. **Affirmed.** (SANDERS, J., dissenting.)

*V. H. Vargas*, for Appellant:

It is reversible error to single out defendant in criminal case and instruct especially on his credibility. Rev. Laws, 7160, as amended Stats. 1915, p. 191; State v. Blaha, 39 Nev. 115; State v. Rothrock, 45 Nev. 214.

Though circumstances create strong suspicions of guilt, if they are as consistent with innocence as with guilt, there can be no conviction. State v. Cerfoglio, 46 Nev. 331, 336; State v. Fronhofer, 38 Nev. 448.

Expert may not testify as to how wound was inflicted when that is precise fact in issue. 11 R. C. L. 583; 2 Jones, Evidence, 906; Price v. U. S. 101 Pac. 1036; People v. Smith, 93 Cal. 445.

It is error to admit photographs of premises where crime occurred when only purpose is to prejudice jury. 3 Jones, Evidence, 756, 789; 10 R. C. L. 1156; Guhl v. Whitcomb, 85 N. W. 142.

*H. W. Edwards*, District Attorney, for Respondent:

Though the instruction probably should not have been given, in view of the 1915 amendment, still there should be showing of substantial injury to warrant reversal. In State v. Blaha, 39 Nev. 115, the court merely said that, while instruction was approved by some earlier decisions, it had been recently criticized.

No judgment shall be set aside for misdirection of jury unless defendant has been prejudiced thereby. Rev. Laws, 7469; State v. McCarty, 179 Pac. 309; 14 R. C. L. 815. Technical errors are disregarded. Rev. Laws, 7302.

Experts may testify as to their belief in given state of facts, and may also testify positively. The jury determine weight to be given their evidence. State v. Kuhl, 42 Nev. 185.

The purpose of photographs was to make the oral testimony more clear. Their admission was proper. Underhill, Crim. Ev. 87; State v. Roberts, 28 Nev. 376.

To quote language of Attorney-General Beatty in State v. Hartley, 22 Nev. 349, "The defendant is not corroborated in her story by any one, nor by any circumstance. On the contrary, her story is so utterly improbable as to destroy itself. This court will not disturb verdict, after motion for new trial was denied, where evidence is conflicting—much less will it do so where evidence is consistent only with guilt of the defendant."

By the Court, COLEMAN, J.:

Dawn Margaret Williams, referred to herein as the defendant, was charged in an information filed by the district attorney with the murder of one Jess Coverley on the 12th day of January, 1923. She was convicted of the crime of manslaughter, and has appealed from the order denying her motion for a new trial and from the judgment.

1. 2. Three questions are presented for our determination, the first going to an alleged error of the court in ruling upon an objection which was made after a witness called as an expert had answered a question. The question and the answer thereto read:

"Q. From your inspection and your examination, what would be your opinion as to the wound being self-inflicted? A. It could not have been.

"Mr. Vargas (attorney for defendant). I object to that, if the court please."

Without considering the timeliness of the objection, we are not able to say that the court erred in overruling the objection. It is a general objection, and whether it went to the competency of the witness to give the testimony or to the impropriety of that line of evidence we are unable to tell. Certainly such testimony might be competent and proper under some conditions. This court has held that a general objection to the admission of testimony, unless it is wholly incompetent, is not sufficient. State v. Smith, 33 Nev. 438, 117 Pac. 19. In State v. Jones, 7 Nev. 415, the court said:

"In criminal as well as in civil cases, the objection should be so pointed that the attention of the court

below may be directed to the exact point, so that the objection may be then obviated, if it be one of that character."

In view of the record we do not think the court committed error in its ruling.

3. Error is assigned to the admission in evidence of a photograph of the room in which the shooting was done, showing the bed and bedclothes, and a discoloring upon a pillow. All that is said in the brief in support of the alleged error is—

"The only purpose of introducing the photograph was to appeal to the passion or prejudice of the jury."

In view of the fact that only a general objection was made to the introduction of the photograph, it not appearing to be wholly incompetent, we cannot say that the court erred. Furthermore, nothing appears in the photograph itself to incite passion or prejudice.

4. We come now to the contention that the court committed prejudicial error in the giving of instruction No. 18, which reads:

"Gentlemen of the jury, the defendant has offered herself as a witness in her own behalf in the trial, and, in considering the weight and effect to be given her evidence, in addition to noticing her manner and the probability of her statements taken in connection with the evidence in the cause, you should consider her relation and situation under which she gives her testimony, the consequences to her relating from the result of this trial, and the inducements and temptations which would ordinarily influence a person in her situation. You should carefully determine the amount of credibility to which her evidence is entitled; if convincing, and carrying with it a belief in its truth, act upon it; if not, you have a right to reject it."

It is clear that the court erred in giving the instruction. Such an instruction received judicial favor in this jurisdiction for many years (State v. Johnny, 29 Nev. 203, 87 Pac. 3), but our legislature in 1915 (Stats. 1915, p. 191) amended section 7160 of our Revised Laws so as to provide that—

"No special instruction shall be given relating exclusively to the testimony of the defendant, or particularly directing the attention of the jury to the defendant's testimony."

But, notwithstanding the error committed, it does not necessarily follow that the judgment should be reversed, for it is expressly provided in section 7469 of the Revised Laws:

"No judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury * * * unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right."

See State v. Willberg, 45 Nev. 183, 200 Pac. 475.

We cannot presume that the legislature by enacting the statute relied upon by appellant as a ground for a reversal of the judgment meant to do more than change the long-existing rule in this state to the effect that an instruction similar to the one in question is proper. It would indeed be remarkable for the legislature to have intended, in the face of the general statute providing that no judgment should be reversed for the misdirection of the jury which resulted in no miscarriage of justice or actual prejudice to the defendant, that the giving of an erroneous instruction in the particular in question should necessarily result in a reversal of the judgment, regardless of whether the defendant was prejudiced or there was a miscarriage of justice. Why should we presume that the legislature intended to place such an instruction in a class all to itself? Why must we presume that the legislature intended to overthrow in one particular the general policy of the law and the tendency of the age to ignore all error which results in no actual prejudice? Must we not conclude that, if the legislature intended such a result, it would have expressly provided for the reversal of a judgment where such an instruction is given? Let us see what an absurd result might follow if we take the contrary view:

Suppose John Smith, a man in the possession of all his members and faculties, goes into a hardware store and purchases a Colt's automatic and cartridges to fit, and as he goes out he says to a half-dozen reputable men that he is going down the street to shoot on sight John Doe, an armless and legless man, and immediately walks out of the store, and within a half-block he sees Doe crawling from him along the sidewalk, and as he comes within ten steps of him, in view of a dozen other reputable men, be begins to shoot Doe in the back, and, continuing to advance, according to the testimony of the twelve men, empties every bullet into the wriggling body of the cripple. He then coolly walks to the sheriff's office, surrenders himself and his gun, and boasts in the presence of several persons of having shot Doe in the back while he was crawling helplessly upon the sidewalk. While in jail he writes a dozen letters to as many different people over a period of months complaining of an ancient grudge against Doe, and in each letter boasts of his fiendish act. He is placed upon trial for his crime, and for the first time sets up the plea of self-defense, offering himself alone as a witness in support thereof in opposition to the letters he had written, the testimony of the men in the store, aud those who saw the shooting, as well as that of the sheriff and others who were present when he surrendered himself, as to his boastful statements made at the time he surrendered, and the evidence of the doctors that the deceased was shot in the back only. In such circumstances should this court reverse a judgment for the sole reason that an instruction was given similar to the one in the instant case? We think not.

The supposititious case which we have suggested borders, we know, upon the absurd, for no man in his right senses is likely to plead in self-defense an attack by an armless and legless man (though we have known some defenses about as ridiculous to be urged); but while this is true, it is the extreme illustration which convinces the minds of some.

There is nothing in the case of State v. Blaha, 39 Nev. 115, 154 Pac. 78, justifying any other view. It

appears from the opinion in that case that the trial court refused to give at the request of defendant an instruction violative of the 1915 amendment; hence there was no occasion to consider the application of section 7160 of the Revised Laws as amended. In the recent case of State v. Cudney, 47 Nev. 224, 218 Pac. 736, the trial court gave an instruction similar to the one given in the instant case. We decline to consider it upon the ground that the defendant did not claim to have been prejudiced thereby, though the attorney-general directed our attention to the error committed. Our position in this case is consistent with the one we took in that one. Section 7160 of the Revised Laws is a general statute meant to apply to every case in which the trial court misdirects the jury; hence the inquiry in the instant case is: Does it appear that the error complained of resulted in a miscarriage of justice, or actually prejudiced the defendant in respect to a substantial right? From a reading of this statute it must not only appear that the trial court erred, but it must appear affirmatively that the error resulted in a miscarriage of justice, or actually prejudiced the defendant. In other words, we can indulge in no presumption favorable to the defendant. Such is the clear, unequivocal, unambiguous provision of the statute.

Let us examine the evidence. It appears from the undisputed testimony that the deceased and the defendant arrived in Ely, Nevada, on November 7, 1922, and continued to reside there as Mr. and Mrs. Coverley up to the date of the tragedy; that the deceased was addicted to the use of narcotics and intoxicating liquor, and was a worthless character. On the 7th of November the defendant obtained work at a laundry, where she continued to work until about December 1. On Thanksgiving Day the defendant became acquainted with Mrs. Frank Buster, after which they and the deceased were often together, indulging freely in the consumption of intoxicating liquor. On the afternoon of January 12, 1923, the deceased and the defendant went to the Buster home, where they remained until the

time of the tragedy, which was about 5:30 in the evening. The bullet which killed the deceased entered the upper lip at a point one inch to the left of the middle line thereof, and passed through the brain, lodging against the skull on the side opposite to that from which it entered. The theory of the defense was that the deceased endeavored to shoot the defendant as a result of a quarrel, and that while he was in the act of shooting she struck his hand, knocking it up in such a manner that the bullet entered the lip of the deceased.

We will first take up the testimony of Sam Harlow. He testified that he was a miner in the employ of the Nevada Consolidated Copper Company; that he went to the Buster home on the afternoon of the shooting between 4 and 5 o'clock, finding Mrs. Buster, the deceased, and the defendant there; that for about thirty minutes they talked among themselves, when the defendant and the deceased went into the back room, and in about ten or twenty minutes the shooting took place; that during all of the time the deceased and the defendant were in the back room Mrs. Buster was lying on the bed in the adjoining room, with the door open between the two rooms, and that he could hear what was said in the adjoining room, and, the light being on, could have seen both parties had he looked. He testified that he thought nothing of the talk going on between the defendant and the deceased, and that his attention was not attracted until he heard the report of a pistol, and, looking immediately, saw the defendant standing with the pistol in her hand; that he went in instantly and took it away from her, and went right out for the doctor.

Mrs. Buster, after testifying as to certain preliminary matters, stated that at the time of the shooting she was lying upon the bed in the room adjoining that in which the deceased was killed; that when she heard the shot she sat up on the bed for a minute, and then started into the room, and as she was going in she met Harlow

coming out going for the doctor. In response to an inquiry as to whether she then said anything to the defendant, she testified:

"Yes, sir; I caught hold of her arm, and said, 'My God, woman, what have you done?' She leaned over me like this (indicating), and said, 'My God, I loved him, and I killed him!'"

She also testified that a few evenings before this she heard the defendant say she would kill the deceased. She gave testimony which is not denied that an effort was made in behalf of defendant to induce her not to testify to the statement of the defendant to the effect she shot the deceased.

Dr. Cook testified to going to the house shortly after the shooting, to being in the district attorney's office with the defendant, Deputy Sheriff Jackson, and the district attorney about twenty minutes later, and to holding the autopsy, and to the facts which came to his knowledge as a result thereof. The doctor testified that he made some notes of the statements made by the defendant while in the district attorney's office; that, in explaining how the trouble started, soon after she and the deceased went into the bedroom she said to him, "Are you going home, honey?" to which he replied, "No; —— —— ——. I have had trouble enough"; that she then saw the gun in his hand pointed at her, when she struck his arm, and the gun went off. He testified that the defendant made the statements while he was at the house and again while in the district attorney's office that if she had had a gun she would have killed the deceased Christmas night. This witness also testified that, when the defendant was asked if she was sorry the deceased was dead, she replied, "I am not, because he will not be with any other woman." "If God is my judge, I hope he is lying there stiff." "Won't you let me go, and I will kill her, too, damn her." He also testified that he counted nineteen powder-marks upon the face of the deceased, those on the eyelids being about two and a half inches from the point at which the bullet entered.

Deputy Sheriff Jackson testified to going to the home soon after the shooting, when he asked the defendant, "How did the quarrel start? How did you come to shoot him?" She said, "Well, he wouldn't be a good, true pal, and I caught him kissing her." That she then went into the next room, where she said, "I didn't kill him." He testified that he then took the defendant to the district attorney's office, where she made certain statements in reply to the questions asked by the district attorney. Mr. Jackson testified:

" 'Well, I went into the room and I says, "Are you going home, honey?" He says, "No; —— —— ——. I won't go home. I have had trouble enough." When he said that I saw the gun pointed right at me in his hand, and I hit his hand and it went off.' And she went on: 'If I had of had a gun I would have killed him Christmas night.' Then the question: 'Why did you want to kill him Christmas night?' She mentioned, 'I am not going to tell why.' Then she had a brief pause, and she says, 'He hadn't been a true husband.' And then she asked the district attorney, 'Won't you let me go, and I'll kill her too, damn her?' Then the question from the district attorney, 'Who do you want to kill if I let you go?' And she said, 'I'll not tell.' And she paused and then she said, 'If God is my judge, I hope that he is lying there stiff.' 'How did you say the trouble started' — the question from the district attorney — or 'row started tonight?' And she says, 'Because I wouldn't be a good, true pal. I couldn't be, and the reason was I was jealous. He kissed her once before.' The question from the district attorney: 'He wasn't kissing her tonight, was he?' And she answered, 'No.' "

It appears that the defendant was spasmodically hysterical during the time covered in the making of her statements, but that she understood what she was talking about.

In behalf of the defense two witnesses were called, the defendant and Dr. Bennett. Dr. Bennett testified as to the distance at which a pistol must be held from

an object that there may be powder-marks. He testified that when a pistol loaded with black powder is discharged at a distance of a foot from a person's face there would be no burning of the face, but that there would be powder imbedded in the face. He also testified that where the muzzle of the pistol is held six inches from the face the powder would spread over the surface for one and a half inches; a little further back it would spread over a three-inch surface. He testified on cross-examination that the hand of the deceased must have been in an unnatural and cramped position for the bullet to have entered at the point it did and lodge where it was discovered.

The defendant was called in her own behalf, and testified concerning several occasions upon which she, the deceased, and Mrs. Buster consumed considerable liquor; of occasions when the deceased neglected and mistreated her. Proceeding, she testified as follows:

"Mr. Coverley had gone on into the other room and set on the side of the bed, and I went in and talked to him, and wanted him to go home, and he kind of laid on the bed like this (indicating), and I laid on the bed like this (indicating), this foot on the floor, and this arm against him; and I was looking into his face, and was pleading for him to go home; and he said, 'I will not go home. I be damned if I go home.' And I still insisted upon his going home, and he said, 'I wouldn't walk across the street with you. I am going to stay right here. You know the way home. I am going to stay right here. I'll not go.' And I said, 'Yes, sir; I know the way home, and tomorrow morning I will wire home for a ticket to my children, and I will go back home, as I am tired of this life, anyway.' And he threw his hand as if he was going to strike me first, and then he said, 'You will not leave me, because I am going to kill you.' And I saw the gun, and hit his hand that way (indicating), and as I hit his hand the gun went off, and I could see the blood, and the last thing I can remember I put my hands over him, and I raised him up, and I fell on my knees and I went into hysterics. I wanted him to talk to me."

She denied making any statement to the effect that she shot the deceased, and stated that if she at any time made any statement whatever about shooting the deceased Christmas night it was that she could have done so if she had wanted to.

Can we say from this evidence that the defendant was prejudiced, or that there was a miscarriage of justice because of the giving of the erroneous instruction? Clearly not. On the contrary, it affirmatively appears that the defendant was not prejudiced in the least degree. The attempt to suppress a portion of Mrs. Buster's evidence is a circumstance to be considered in determining the importance to be attached to it.

" 'The suppression or the destruction of pertinent evidence,' it is remarked by Mr. Starkie, 'is always a prejudicial circumstance of great weight, for, as no act of a rational being is performed without a motive, it naturally leads to the inference that such evidence, if it were adduced, would operate unfavorably to the party in whose power it is.' " 2 Wharton's Crim. Ev. (Hilton), sec. 748; 22 C. J. 111; 1 Jones, Ev., sec. 16; State v. Cerfoglio, 46 Nev. 332, 205 Pac. 791.

The testimony sought to be suppressed was that wherein Mrs. Buster testified that the defendant stated to her soon after the shooting that she had killed the deceased. In addition to Mrs. Buster's testimony there is the testimony of Dr. Cook and Deputy Sheriff Jackson of the statements made by the defendant. These statements show the mental attitude, after the killing, of the defendant toward the deceased. If she had not done the shooting she would and could not have entertained the feeling toward him which is manifested thereby, assuming that the testimony of those witnesses is to be believed. In addition to this testimony is the testimony of Harlow, who, from his own evidence and the photographs, was, at the time of the shooting, sitting where he could see the bed upon which was the deceased when shot; that he looked into the room instantly after the shooting and saw the defendant standing beside the bed with the pistol in her hand,

and rushed in and took it from her. This testimony is not denied. If it is true, the testimony of the defendant must be false. Harlow's testimony is not impeached in the least, nor was there an effort made to impeach it.

But, if we put aside the above evidence, it is clear that the deceased could not have shot himself, as claimed by the defendant. The uncontradicted expert testimony on the part of the state is to that effect, and, while the testimony on the part of the defendant does not put it so bluntly, it amounts to substantially the same thing. Dr. Bennett, the defendant's witness, testified that, if the deceased was shot as testified to by the defendant, his hand must have been in an unnatural and cramped position. In the light of this testimony, is not the testimony of the defendant so highly improbable as to discredit itself? How could the hand of the deceased have gotten in an unnatural position by a blow such as testified to by the defendant? It was physically impossible.

"Evidence, to be believed," said Vice-Chancellor Van Fleet, "must not only proceed from the mouth of a credible witness, but it must be credible in itself—such as the common experience and observation of mankind can approve as probable under the circumstances. We have no test of the truth of human testimony, except its conformity to our knowledge, observation and experience. Whatever is repugnant to these belongs to the miraculous, and is outside of judicial cognizance." Daggers v. Van Dyck, 37 N. J. Eq. 130.

"That probability is the guide of life is an obvious truth. But the experience has been a commonplace for more than a century and a half, and, though there has been abundant discussion of the nature of probability, I do not think that more can well be said on this great subject than that a statement is probable to whatever extent it generically resembles the common course of human conduct and of physical nature. * * *" Stevens, General View of the Criminal Law of England, pp. 192, 193.

In a case of conviction for murdering a woman by cutting her throat with a razor, "the theory that the killing was the result of an accident, occasioned by the defendant supposing that he was drawing the back of the razor across the throat of his victim, was so utterly preposterous that there could be no rational expectation that any jury of sensible men would give it the least consideration," said the Pennsylvania Supreme Court. Com. v. Von Horn, 188 Pa. 143, 41 Atl. 469.

We might multiply such quotations were it necessary.

In the light of these quotations, let us see if the defendant's testimony is worthy of consideration; if it is "credible in itself"; if the result testified to "resembles the common course of * * * physical nature." In determining these propositions, let us inquire whether the hand and arm of the deceased, if in the act of shooting the defendant, would have been limp or rigid. There can be but one conclusion. It would naturally be rigid, otherwise the pistol would dangle rather than be presented in any direction. If rigid, while a sudden blow under the hand would knock it upward, there would be a natural resistance that would prevent the arm doubling up into a position necessary to have inflicted the wound upon the lip of deceased. Furthermore, under the undisputed testimony of Dr. Bennett, a witness for the defendant, the muzzle of the pistol must have been at least six inches from the face of the deceased to have enabled the powder to scatter over his face for one and a half inches, and a little further back to have spread three inches. The undisputed evidence is that it spread two and a half inches. Hence it follows that the muzzle of the pistol must have been more than six inches from the face of the deceased when fired. Could the deceased have held the pistol and gotten it in a position to inflict the wound in question and yet the muzzle have been more than six inches from the face? The expert's uncontradicted testimony was correct. It was a physical impossibility. It needs no illustration or demonstration to justify this statement. The testimony of the defendant is incredible in itself.

The trial court, in denying the motion for a new trial, while apparently recognizing that an error had been committed in giving the instruction complained of, observed that substantial justice had been done.

No prejudicial error having been committed, it is ordered that the judgment be, and the same is hereby, affirmed.

DUCKER, C. J.: I concur.

SANDERS, J., dissenting:

Under an information filed against her in the court below, Dawn Margaret Williams, a citizen of this state, was convicted of the crime of manslaughter, and sentenced to confinement in the penitentiary for the term of not less than one nor more than ten years. She insists she was not tried according to law, in that the trial court, upon the request of the district attorney, and over her objection and earnest protest, gave an instruction to the jury which related solely to her testimony given as a witness in her own behalf, and particularly directed the attention of the jury thereto in such language as to make it appear to them that in the opinion of the court her testimony was unworthy of belief. It is conceded that the instruction is in violation of the express prohibition contained in section 310 of the criminal practice act as amended by the legislature of 1915. Both the statute as amended and the instruction are set out in the opinion of Justice COLEMAN, to which reference is here made.

In the case of State v. Blaha, 39 Nev. 115, 154 Pac. 78, the court expressed its opinion as to the purpose, object, and necessity which brought about the amendment, but it did not decide what legal effect the refusal of the court to obey the statute would have upon a judgment pronounced upon a verdict of guilty in a case otherwise without error.

In the case of State v. Cudney, 47 Nev. 224, 218 Pac. 736, we declined, of our own motion, to examine a similar instruction, it not appearing that the defendant objected. In that case the question whether the right

afforded the defendant by the statute was a right that could not be waived was considered. Upon examination of the authorities, I reached the conclusion that, while the statute recognized the defendant's substantial right to have his or her testimony weighed under instructions from the court the same as the testimony of any other witness, it was not such a right or privilege that it could not be waived. Here the case is different. In the case at bar the defendant contends that she was not tried according to the method which the law makes essential in proceedings involving the deprivation of life and liberty. It is the birthright of every citizen, when charged with crime, to be tried according to law. Such trial must be conducted in due course, according to the prescribed forms and judicial procedure of the state for the protection of the individual rights and liberties of its citizens.

The statute as amended is a legislative recognition that the testimony of the defendant is entitled under the law to be considered and weighed by the jury under instructions from the court the same as the testimony of any other witness, and it was the purpose of the amendment to safeguard and protect the defendant's individual right by prohibiting trial courts from giving a special instruction relating exclusively to testimony of the defendant, or particularly directing the attention of the jury to the defendant's testimony. If it is one of the functions of the judiciary to take from the defendant the individual right afforded and guaranteed by statute, the court must find its power or authority so to do from some source other than the law. In virtue of the statute, the defendant's testimony is placed upon the same basis as that of other witnesses, but in this case the trial court arbitrarily ignored the law, and this court condones its unauthorized act by a process of judicial interpretation which, to my mind, results in the nullification of the law.

If I do not wholly misapprehend the scope and legal effect of the present decision, it decides that the statute

in question in no way affects section 619 of the criminal practice act (Rev. Laws, 7469), which provides that no judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury, unless, in the opinion of the court, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right. I am of the opinion that section 619 does not stand in the way of this court in the performance of its duty to correct a legal wrong done a defendant by the refusal of a trial court to conduct a trial in a criminal action according to the prescribed forms and judicial procedure of the state for the protection of the individual rights recognized and safeguarded by a prohibitive statute. This court is constituted to enforce legal rights and redress legal wrongs. The amendment of 1915 and section 619 of the criminal practice act, with respect to instructions of the character of the one under review, are in pari materia, and must be construed together. The statute, as amended by the legislature of 1915 impliedly amends section 619 so as to prohibit courts from calling the attention of the jury by an instruction to the credibility of a defendant in a criminal action when he appears as a witness in his own behalf.

According to the reasoning of my associates, the instruction is a mere error of law which did not result in a miscarriage of justice. It does not meet the point to say that the instruction is erroneous, but did not result in a miscarriage of justice. The instruction is in no sense erroneous, but it is an unauthorized instruction; one which is prohibited by law. The fact that a legal wrong is perpetrated through an instruction is no less subject to correction that if it were perpetrated in some other manner. The right recognized and afforded the defendant by the statute is a substantial right. Section 619 expressly provides that, where the defendant is actually prejudiced in respect to a substantial right,

it is the duty of this court to correct the wrong. Defendant had the right to have her testimony safeguarded and protected against the unauthorized attack made upon it by the trial court, and to stand before the jury garbed in the innocence which the law throws about her, without an instruction from the court to the jury that, in considering the weight and effect to be given her evidence, in addition to noticing her manner and the probability of her statements taken in connection with the evidence in the case, they should consider her relation and situation under which she gave her testimony, the consequences to her relating from the result of the trial, and the inducements and temptations which would ordinarily influence a person in her situation. The instruction seems to leave an implication that it was incumbent upon the jury to consider the defendant's testimony as false, and for that reason to reject it. The statute as amended prohibits such methods of charging the jury, and in consequence of its violation the defendant was not only prejudiced in respect to her substantial right, but was not tried according to law.

I dissent from the opinion and the judgment of the court.