THE STATE OF NEVADA, Respondent, v. EDMUND
GEORGE LINDSAY, Alias GEORGE EDWARD
LINDSAY, Alias TOMMY MARINO, Appellant.

No. 3433

August 6, 1945.                                        161 P. 2d 351.

*Sidney W. Robinson,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *George P. Annand* and *Homer Mooney,* Deputy Attorneys General, and *Melvin E. Jepson,* District Attorney, and *Harold O. Taber,* Deputy District Attorney, both of Reno, for Respondent.

## OPINION

By the Court, ORR, J.:

■ Appellant was convicted of the crime of robbery, and in his appeal to this court seeks a reversal of the judgment of conviction solely upon the ground of alleged misconduct of the district attorney. The misconduct charged consists in the asking by the district attorney, of one McDonald, a witness for appellant, during cross-examination, of the following question: "Isn't it a fact that you told Mr. Gily that you and Lindsay did time together in Walla Walla, Washington?" It is appellant's position that in asking the said question the district attorney violated the rule of law that evidence tending to connect accused with the commission of a crime independent of and unconnected with the one with which he is on trial is incompetent. Such is the general rule. 22 C. J. S., Criminal Law, sec. 682, p. 1084; 20 Am. Jur. p. 287, sec. 309 et seq. There are exceptions to this general rule, but the question here complained of does not come within any of such exceptions. The exceptions are clearly set out in the cases of State v. McFarlin, 41 Nev. 486, 172 P. 371, and State v. Hall, 54 Nev. 213, at page 237, 13 P. 2d 624.

■ The asking of the question complained of came

after the witness McDonald denied on direct examination that he knew appellant or had at any time seen him prior to his (the witness') appearance in court. The district attorney argues, in justification of the asking of said question, that he had a right to show prior inconsistent statements. The witness gave a rather indefinite answer to the question. The district attorney moved to strike the answer; the motion was denied; appellant objected to the question on the ground that it tended to show that the appellant was guilty of an independent crime; the objection was overruled, and the witness answered: "I don't remember ever making such a statement."

We think the asking of this question was erroneous and the objection thereto should have been sustained, but we take the same view as did the court in the case of People v. Doetschman, Cal. App., 159 P. 2d 418, at page 423, wherein it is said: "While the district attorney erred in asking the questions, no such intentional misconduct appears as would justify a reversal on that ground." In People v. Doetschman, supra, it will be noted that a number of questions relating to other crimes were asked by the district attorney.

■ We reach the conclusion that the error complained of would not justify a reversal particularly in view of our statute, sec. 11266 N. C. L., and the construction placed thereon by this court to the effect that in Nevada before a judgment be reversed it must affirmatively appear that there has been a miscarriage of justice or that the defendant has been actually prejudiced. State v. Ramage, 51 Nev. 82, at page 87, 269 P. 489; State v. Williams, 47 Nev. 279, at page 285, 220 P. 555; State v. Willberg, 45 Nev. 183, at page 188, 200 P. 475.

■■ The evidence in this case clearly established the guilt of the appellant. We not only have his confession to participation in the crime, but also the testimony of a young woman who admitted her participation therein and positively identified the appellant as the third member of the trio who staged the hold-up. The confession

was made to one John H. Polkinhorn, special agent of the federal bureau of investigation; it was received in evidence without objection and recognized to have been freely and voluntarily made. We quote the testimony given by the witness Polkinhorn, because we think it establishes, beyond question, that no miscarriage of justice occurred in this case:

"A. Mr. Lindsay told me that he and Tommy Ryan went to the Dog House early on the morning of April 22d and held the place up. He stated that he and Ryan talked it over on the evening of the 21st of April 1944 and that they decided then that they were going to hold the Dog House up. He stated they went there and Ryan had a Lueger, a German Lueger, they went inside of the Dog House, they held up a Chinaman there, they went to the safe, the front door of which was open, and they knocked the door, the inner door off with a crowbar. I asked him where the crowbar came from, but Lindsay said he didn't know where the crowbar came from, but he and Tommy Ryan, that is McDonald, pried the door off.

"He stated that they got approximately five thousand and forty dollars out of the safe. He said the papers said they got about twenty thousand out of the safe, but that was not correct. He said they got $3,040.00 silver, and $2,000.00 in currency. That then they left, and they hung around Reno for approximately one week, at which time Ryan bought a car and truck at a garage, or a service station next to a Columbo Hotel in this town; they then went up to Boise, Idaho, and Ryan got arrested, got drunk and was arrested by the police there, and Lindsay then hitch-hiked from there on into Oregon and into Washington.

"He stated that he then met a man by the name of Julian Ferguson whom he had known at Walla Walla penitentiary, and told him, Ferguson, that his name was Richard Strague. Ferguson said he needed a chef at the Interstate Restaurant that he, Ferguson, was running in Willows, and he decided that he would go down and

work as a chef. His wife, Mary Lindsay, and himself, then came down in their automobile, which is a 1936 Plymouth, with Washington tags, and Ferguson and his woman, or wife, came down at the same time.

"He said they left Tacoma, Washington, where he had met this Ferguson, about June the 17th and they got to Willows about June 21, 1944, and then he started working as a chef in the Interstate Restaurant for Ferguson.

"Q. I show you State's Exhibit A for identification, and ask you to examine it, please: Have you ever seen that gun before? A. Yes, sir.

"Q. Where did you get it? A. It was turned over to me by Agent Robert Gocke of the Federal Bureau of Investigation.

"Q. When. A. On August the 13th, 1944, Sunday.

"Q. Was that the day you talked with Lindsay? A. I talked to him the following day, Monday.

"Q. In your conversation with Lindsay did he say anything about this gun? A. Yes, sir.

"Q. What did he say? A. He said that this was a gun that Tommy Ryan took out of the Dog House safe and handed to him in the Dog House at Reno, Nevada, on the night of the robbery—on the morning of the robbery.

"I asked him why he filed the numbers off the gun, and he said that he did not file them off the gun, that that is the way it was given to him. He said there were several other guns in the safe when Ryan took this out.

"I might add, that during our conversation in the ante-room at the Glen County jail, I started to take notes when I was talking to Mr. Lindsay, and Lindsay said, 'I won't tell you anything if you take notes.' So I stopped. I showed him the gun at that time and the minute I came out of the ante-room with Lindsay I put down the figures that he gave me, and I also marked this gun and the magazine and the five bullets.

"My understanding was that the bullets were in the magazine when the gun was found in Room 31 of the

Palace Hotel by agents of the Federal Bureau of Investigation, but there were no bullets in the chamber.

"Q. Well, can you identify the markings on it? A. Yes, sir, my initial 'P' scratched right up here, (indicating). I also marked the magazine on the back with my initial 'P.'

"Q. So you are positive that that is the gun that you and Lindsay talked about, is that right? A. That is the gun that he said came from the Dog House, yes, sir.

"Q. He made that statement? A. Yes, sir.

"Q. That Ryan took it out of the safe and gave it to him? A. That is correct, sir.

"Mr. Taber: We offer the gun in evidence.

"The Witness: He stated when they went in he had no gun in his possession, when they went into the Dog House that Ryan had the gun, a gun, a German Lueger."

There is in the record the testimony of Al Hoffman, a coowner in the Dog House, the place that was robbed, to the effect that he kept a 32 Colt's automatic in his safe in said building, that he examined the safe after the robbery, and that the gun was missing.

In the case of People v. Epstein, 21 Cal. App. 2d 488, 69 P. 2d 454, 455, a robbery case, the court, in considering an alleged error relative to the improper admission of evidence, stated:

"The law is settled that a judgment will not be set aside in any case on the ground of (a) misdirection of the jury or (b) improper admission or rejection of evidence, unless there has been a miscarriage of justice. Article 6, sec. $4\frac{1}{2}$, Constitution of the State of California. Therefore, conceding without deciding that the trial court's rulings were erroneous, defendant may not urge them as error in this court, in view of his confession that he participated in the crimes with which he was charged. Thus there was no prejudice or miscarriage of justice resulting to him."

The holding in the case of People v. Epstein, supra, was followed in the case of People v. Hamet, a recent

case, reported in Cal. App., 159 P. 2d 702, at page 703. The court, in People v. Hamet, used substantially the same language as that used in the case of People v. Epstein, to-wit:

"The law is settled that a judgment will not be set aside in any case on the ground of improper admission or rejection of evidence, unless there has been a miscarriage of justice. Art. VI, sec. 4½, Constitution of Calif. Therefore, conceding without deciding that the trial court's rulings were erroneous, defendant may not urge them as error in this court, in view of his admission that 'he had been making book at this place' for about two months. Such statement constituted a confession that he had participated in the crime with which he was charged. Thus no prejudice or miscarriage of justice resulted to him from the alleged erroneous rulings."

So in the instant case, in view of the confession of the appellant that he participated in the crime with which he is charged and which said confession is corroborated by the evidence of one of the participants, Annabelle Allen Peterson, no prejudice or miscarriage of justice resulted because of the asking of the question complained of.

■ There is a further reason why the error of the district attorney in asking the said question was harmless. It will be noted that in the confession by appellant to the witness Polkinhorn appellant stated "that he then met a man by the name of Julian Ferguson, whom he had known at Walla Walla penitentiary, and told him, Ferguson, that his name was Richard Strague." This statement contains a very similar intimation to that contained in the question asked by the district attorney and had as great a tendency to connect the defendant with Walla Walla penitentiary and the same inference as to the commission of an independent crime. Said testimony was received without objection and no motion to strike was made. It stands in the record uncontradicted. Counsel for appellant in this court did not represent appellant in the trial court.

■ The rule with respect to admission of improper evidence being harmless where the same or similar evidence has been admitted without objection is stated in 5 C. J. S., Appeal and Error, sec. 1724, note 8, p. 974, as follows:

"Similarly, error in the admission of evidence may be harmless where the same or similar evidence has been admitted without objection."

See, also: 5 C. J. S., Appeal and Error, sec. 1730, note 99, p. 1004; McClaskey Cash Register Co. v. Krause, Tex. Civ. App., 31 S. W. 2d 858; Export Ins. Co. v. Axe et al., Tex. Civ. App., 36 S. W. 2d 572; Baker v. Farmers' Welfare Union, Tex. Civ. App., 3 S. W. 2d 155, at page 157; Watson Co. v. Bleeker et ux., Tex. Civ. App., 10 S. W. 2d 394, at page 395; Burke v. Power's Estate, 100 Vt. 342, 137 A. 202.

No prejudicial error appearing, the judgment is affirmed.