WALTER HORACE SEFTON, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 3863

April 4, 1956. 295 P.2d 385.

(Rehearing denied May 24, 1956.)

*John W. Bonner,* of Las Vegas, for Appellant.

*Harvey Dickerson,* Attorney General, of Carson City;

*George M. Dickerson,* District Attorney, *Gordon L. Hawkins, Robert L. Gifford, Ve Noy Christofferson, Arthur Olsen,* Deputy District Attorneys, all of Las Vegas, for Respondent.

108

# OPINION

By the Court, BADT, J.:

Appellant was convicted of the first-degree murder of Jacqueline Kelly in Clark County, Nevada, and sentence of death imposed. His appeal from the judgment and from the order denying his motion for new trial assigns the errors hereinafter discussed in the order of the seriousness and importance accorded them by the appellant in his opening and closing briefs and in his oral argument.

(1) Appellant's most seriously presented assignment of error revolves about the contention that, aliunde his extrajudicial written confession, there is no proof of the corpus delicti; that there is no corroboration of his confession; that accordingly, in the first instance, the State's case falls by reason of failure to prove the corpus delicti; that by reason of the failure to prove the corpus delicti, there was no foundation for the admission of evidence of the written confession.

On Christmas day, December 25, 1953, four men, who had gone to a desert area on the outskirts of Las Vegas, an area sometimes referred to as "the jungle," for the

purpose of rifle practice, found the dead body of Jacqueline Kelly. One of the men remained with the body but was careful not to disturb it or the area around it. The other three drove back into the city to report their discovery and the sheriff's office sent three deputies to the scene. Sundry photographs were taken and a plaster cast made of a boot print in the sand a few feet from the body. Various garments of the deceased were found close to the body—her left boot (her right boot was on her foot), a square scarf, slacks or jeans, a dark green blouse, a brassiere, etc. The body was identified as that of Jacqueline Kelly and was removed to the mortuary where an autopsy was performed, disclosing, in addition to four lacerations on the head, four prominent lacerations in the neck and body, besides contusions about the right forearm, both hands and both thighs. It was the doctor's opinion that the wounds were caused by a fairly sharp instrument such as a pocket knife. The skull fracture and resulting hemorrhage, two stab wounds in the chest and two additional wounds were, in the doctor's opinion, the three primary causes of death. Evidence of the matters above recited was received before the State offered defendant's written confession. Thus the fact of death and that it resulted not from natural causes, accident or suicide but from the criminal agency of another person had been clearly proved beyond a reasonable doubt. The corpus delicti had thus been established. State v. Fouquette, 67 Nev. 505, 532, 221 P.2d 404. We reject the contention of appellant made in reliance on State v. Teeter, 65 Nev. 584, 200 P.2d 657, that proof of the corpus delicti must include not only the element of the death of the deceased and that it was by a criminal agency, but a third element, namely, the identification of the defendant as the criminal agency. Nor need the proof of the corpus delicti "be as full and conclusive as would be essential if there was no confession to corroborate it. Evidence of facts and circumstances attending the particular offense * * * or of facts to the discovery of which the confession has

led, and which would not probably have existed if the offense had not been committed, or of facts having a just tendency to lead the mind to the conclusion that the offense has been committed, would be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court." Norcross, J., In re Kelly, 28 Nev. 491, 83 P. 223, 225, quoting Matthews v. State, 55 Ala. 187. It is stated in 22 C.J.S. 1472, Criminal Law, sec. 839: "* * * [I]t is the general rule * * * that an extrajudicial confession does not warrant a conviction unless it is corroborated by independent evidence of the corpus delicti. * * * [A] conviction based on a confession will stand, although it is uncorroborated otherwise than by proof of the corpus delicti." Footnote 41 to this text cites many authorities in support of this rule and, where corroborating evidence has been adduced the rule is further stated (id. footnote 41, (1): "The corroborating evidence need not be such as to connect accused with the crime." Hundreds of cases in support of this rule are cited in the note, as well as in the additional footnotes appearing in the pocket part, and such rule would seem to be of well-nigh universal application. Not only was the corpus delicti proved aliunde the confession, but the same received ample corroboration in the defendant's leading the officers to the scene of the crime, the correspondence of the wounds in the body with those described in the confession, the correspondence of the kind and color of the victim's clothing, the condition of the victim's brassiere as cut by the upthrust of defendant's knife as described by him, the defendant's possession of his foster father's knife corresponding in description with the murder weapon described in his confession, and the correspondence of the plaster cast of the footprint near the body with the defendant's boot. These were all matters of corroboration whose weight was for the determination of the jury. It was likewise the jury's province to reject the defendant's testimony of his visit to the scene of the

crime, with another girl, at which time he saw the victim's body lying on the ground, which he would have had the jury believe accounted for his trip to the scene, his knowledge of the route, his knowledge of the nature of the wounds and the nature and color of the victim's clothing, and accounted likewise for his footprint near the body. The jury was likewise authorized to reject his story that he failed to report his alleged discovery to the police for fear of being himself accused of the crime.

We come then to the actions of the defendant, his prolonged drinking debauches with his friend Charles Mobley, his statement to Mobley that he had killed a girl, had left no clues, but that the "heat was on him" and he wanted to get out of town, his departure from Las Vegas about January 22, 1954 with Mobley, his subsequent arrest in Flint, Michigan, on a burglary charge, his plea of guilty thereto and his volunteered statements to the Michigan officers that he had killed Jacqueline Kelly in Las Vegas, the corroboration by telephone of the fact that Jacqueline Kelly's death still remained unsolved there, followed by the voluntary written confession made by appellant to the Michigan officers. The written confession was by way of questions and answers, all of which were recorded on a tape, transcribed, read by the witness, corrected by him in a minor respect and signed and sworn to by him. Prior to the time he stated to the Michigan officers that he had killed Jacqueline Kelly, they had no knowledge of the matter whatsoever. The initial part of the question and answer document was a statement by the Michigan officer to appellant as follows: "During our conversation you have admitted to us that you were involved in a murder in the City of Las Vegas in the State of Nevada. I want to inform you that we would like a statement regarding this matter. You do not have to give us a statement if you do not desire to do so. If you should give us a statement, everything you tell us must be the truth, the whole truth and nothing but the truth, to the best of your knowledge and recollection. The statement must be given

freely and voluntarily without any force, threats or promises having been made on our part. Such a statement may be used either for or against you as the case might be, should this matter come to trial in criminal court. Knowing these things, will you give us a statement? A. Yes." Appellant then proceeded in question and answer form, as noted, to recite the following facts, in which recital we have eliminated many incidental and unessential statements and which we have condensed for purposes of brevity. On December 18, 1953 appellant drove to a liquor store in Las Vegas to buy some wine. He met Jacqueline Kelly and the two drove to a desert area about a mile north of Vegas Heights, a suburb of Las Vegas. They drank the wine and engaged in acts of sexual intercourse, returned and purchased more wine and again drove back to the desert area and drank it. On a third trip to town appellant sold his auto jack for $2 to a secondhand dealer, purchased more wine and the two returned to the desert area. There, while seated in the car, an argument started. Jacqueline said she was going back to town and say that appellant had raped her. He struck her on the left side of the jaw and mouth with his right hand, got out of the car, went around to the other side, opened her door and jerked her out, struck her and knocked her down, got a knife out of the glove compartment, stabbed her in the throat and several other places. There was some wine left in the bottle, which he drank, then turned the car around as Jacqueline was getting to her knees and drove past her and back to town. She was then bleeding severely from the throat. Appellant gave further descriptive information. The victim had on a green blouse and a pair of cowboy boots and a pair of Levis. On the way back he threw the knife out of the window. It had a green plastic handle. He also threw the wine bottle away. He wiped the blood from his hands and the knife blade with his handkerchief, which he also threw away. He then drove up to the house where his foster parents lived and went to sleep in the car. His foster father subsequently woke

him up and had him go into the house to bed. He left Las Vegas three or four weeks later with Charles Mobley, who had come to live with him and with whom, as noted above, he had indulged in much drinking. (He and Mobley had become acquainted while both were serving terms in the Nevada state penitentiary.) Both he and Mobley had drawn all the money they had coming from work, drank it up and drove to Phoenix. Appellant called his foster mother from Phoenix, told her they were drunk and broke and that they would bring the car back home if she would send them money. She sent $5. In the meantime he borrowed $10 and a tank of gas from a cousin, and they proceeded to El Paso, then to Houston, then to Memphis, Louisville and to Flint, Michigan. The car they were driving was being paid for in installment payments. They abandoned the car about sixteen miles from Pontiac, Michigan.

Appellant waived extradition and was brought back to Nevada. About ten days after being returned to Nevada, defendant agreed to take the officers to the scene "where he told them he had killed this woman." Thereupon defendant and three officers and the deputy district attorney proceeded to the area. The defendant directed the route to be taken and what turns should be made, what streets they should take—under the railroad pass, out an old dirt road, down a little hill, and the defendant finally said: "Stop right about here." He got out of the car, hesitated a few seconds, walked right to the scene and said: "This is where I did it." Photographs were taken showing the defendant pointing to the spot. All of this was done voluntarily by him. He showed the officers where he had parked his car, where the act had been committed, how he got back into the car, drove to the base of the hill, backed around and went out by the same way he had come in. On the way back he indicated about how he had thrown the knife and bottle away. The party searched the area for about two hours but failed to find the knife.

When a Clark County deputy sheriff went to Flint,

Michigan, to bring appellant back to Nevada he searched appellant's automobile and discovered a pair of boots which appellant stated were his. The boots and the plaster cast of the boot print near the body were received in evidence. A sheriff's deputy testified that they matched perfectly "by measurement." Appellant characterizes any attempt to fit the boot to the cast as ridiculous. We do not find it so. Considering the fact that the print was made in the sand and that some seven days had elapsed before the impression was made, the jury would have been justified in considering the imprint surprisingly clear and in finding convincing correspondence between the boot and the cast of the imprint. (By stipulation and order of the court the original exhibits were sent up to this court.) Defendant's foster father collected knives as a hobby and had possessed a knife closely fitting the description of the knife described in defendant's confession. Such knife was in defendant's possession the last time his foster father had seen it— although his foster father testified that he had instructed defendant to return the knife to the tool box where it was usually kept and that such had been done.

(2) In view of our recital as to the manner in which the defendant's confession was executed, we must also reject appellant's contention that the confession was not voluntary.

(3) During the first day of the trial appellant appeared in court handcuffed and error is assigned in the court's refusal to require the removal of the handcuffs. The following occurred: "By the Court: Let the record show that Mr. Bonner requested that the defendant appear in court without handcuffs. The request was objected to by Mr. Mendoza upon the ground that the defendant, within the past twenty-four hours, had broken jail, and was a party to aggravated battery on the jailer, and was not apprehended until 5:00 a.m. this day. For the reason given by Mr. Mendoza, the District Attorney, the request of Mr. Bonner is denied."

And on the following day: "By the Court: The Sheriff having indicated to the Court that he felt it was no longer necessary to have the defendant appear in Court with handcuffs, it is ordered, and the Sheriff is directed to remove said handcuffs from the defendant prior to his entry into the Court Room. The record will show this order was made outside of the presence of the Jury." In support of this assignment appellant quotes at length from State v. McKay, 63 Nev. 118, 165 P.2d 389, 167 P.2d 476. We concur in the view there expressed that the right of a defendant to be free from shackles at his trial is an important right and that the shackling is legally justifiable only in the existence of exceptional conditions of fact and circumstance reasonably rendering a departure necessary. But we cannot say that the course pursued was not, in the exercise by the court of a sound judicial discretion, reasonably necessary and justified. On rehearing, in State v. McKay, supra, the court noted the reasonable apprehension that if the handcuffs were removed, the defendant, a dangerous and desperate man, might at any time, even at the time of the trial, attempt to escape, and that appellant himself by his own conduct was the primary cause of any prejudice entailed by his being handcuffed. Here, as in the McKay case, we find no abuse of discretion. Appellant also relies on Odell v. Hudspeth, 10 Cir., 189 Fed.2d 300, which recites the rule against handcuffing except to prevent the escape of the prisoner or to prevent him from injuring bystanders and officers of the court or to maintain a quiet and peaceable trial. The district court, however, refused to interfere on habeas corpus and the Circuit Court of Appeals, Tenth Circuit, affirmed. There, as here, no such situation existed as in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, or as in Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.

(4) Appellant sought to introduce in evidence fifteen copies of criminal complaints and docket entries from

the Las Vegas municipal court, in which the deceased was the defendant. Outside of one petty larceny charge, the complaints all charged the deceased with being drunk and disorderly in a public place in the city. Appellant's theory is that these complaints would have established such propensity and habits of drunkenness, vagrancy, etc. as to indicate to the jury her habit of frequenting "the jungle" where the crime took place, and would have tended to disprove the State's theory that appellant took her to the area and killed her there. Error is assigned in the court's sustaining an objection to the admission of these records on the ground that they were irrelevant and immaterial. Even if we assume the rather doubtful conclusion that the deceased's propensity for being found drunk in a public place would likewise establish her propensity (or corroborate defendant in this regard) to frequent the jungle, proof indicating the probability that she might have been there on earlier occasions, could hardly be material to the inquiry as to whether she had been killed at that spot by the defendant on December 18, 1953. We find no error in rejecting this proof.

(5) In repudiating his confession appellant insisted that he originally confessed the murder to the Michigan officers because he feared a life sentence there as a habitual criminal and wanted to be returned to Nevada where he would have the assistance of his foster parents, and because he understood from the Michigan officers that they would permit his return to Nevada on nothing less than a murder charge. Accordingly, he sought to introduce certain self-serving statements made by him which he claims would tend to prove that he repudiated his confession immediately upon his arrival in Nevada. In the first place, the testimony was properly excluded as self-serving statements; in the second place, the evidence rather conclusively shows that these statements were not made for some ten days after his arrival and after he had voluntarily directed the officers to the scene

of the crime. Appellant asserts that the prosecuting attorney and his witnesses sought to make it appear to the jury that the repudiation of the confession was concocted in the mind of defendant's counsel, and that defendant should have been given an opportunity to refute this impression. We may put aside, as of no great moment, the inconsistency of the first assignment, namely, that the confession was not voluntary, with the present assignment, that the defendant concocted the confession as a ruse to get back to Nevada and urged the confession upon the Michigan officers who were reluctant to receive it at all. In any event, the so-called immediate repudiation was some ten days after his return and after he had directed the officers to the scene. Nor was the repudiation relied upon a repudiation at all, but rather a refusal to discuss the matter. Appellant's entire theory of his successful persuasion of the Michigan officers, including minute details of the time, place and circumstances of the crime, description of the wounds and of the victim's clothing, etc. (subsequently substantiated and corroborated), just for the purpose of getting back to Nevada to face a first-degree murder charge, apparently seemed so fantastic to the jury that they gave it no credence. Not only do we find no error, but we do not think that it may be reasonably said that the jury could have been influenced by the testimony.

(6) Appellant assigns error in the court's striking from the record certain parts of appellant's opening statement to the jury which asserted the conviction of defendant's foster parents that defendant was innocent and counsel's desire not to see the defendant wronged. Such matters could not have properly been made the subject of testimony and were properly excluded. "It is the duty of counsel * * * to refrain from stating facts which he cannot, or will not, be permitted to prove." State v. Olivieri, 49 Nev. 75, 236 P. 1100.

No error is assigned growing out of the giving or refusing instructions to the jury. Several errors are assigned in the court's rulings on evidence in addition to those already discussed. They are not of sufficient importance or seriousness to warrant discussion. Appellant asserts from time to time that by reason of the errors assigned, there has been a lack of due process in violation of both the state and federal constitutions. Such assignments have been given careful consideration, but we find the same to be without merit. It is our conclusion that the defendant has not been prejudiced by reason of any of the assigned errors and that there has been no indication of any miscarriage of justice. State v. Lindsay, 63 Nev. 40, 161 P.2d 351.

The judgment and the order denying appellant's motion for new trial are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison of the judgment rendered.

MERRILL, C. J., and EATHER, J., concur.